EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pedro J. Giovanetti y la SLG compuesta por él y su esposa María de los Ángeles Lugo<br><br>    Demandantes-Peticionarios<br><br>              v.<br><br>Estado Libre Asociado de Puerto Rico, Centro de Fomento de Empresas para Jóvenes, Inc. y Compañía de Fomento Industrial de Puerto Rico<br><br>    Demandados-Recurridos | Certiorari<br><br>2004 TSPR 46<br><br>161 DPR \_\_\_\_ |

Número del Caso: CC-1999-64

Fecha: 29 de marzo de 2004

Tribunal de Circuito de Apelaciones:
                    Circuito Regional I

Juez Ponente:

                    Hon. Miguel A. Giménez Muñoz

Abogado de la Parte Peticionaria:

                    Lcdo. Lcdo. Alfredo Ortiz Ortiz

Oficina del Procurador General:

                    Lcdo. Héctor Clemente Delgado
                    Procurador General Auxiliar

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro J. Giovanetti y la SLG
compuesta por el y su esposa
María de los Ángeles Lugo

    Demandantes-peticionarios

       vs.                     CC-1999-64      CERTIORARI

Estado Libre Asociado de Puerto
Rico, Centro de Fomento de
Empresas para Jóvenes, Inc. y
Compañía de Fomento Industrial
de Puerto Rico

    Demandados-recurridos

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 29 de marzo de 2004

Mediante el presente recurso se nos solicita que revisemos una sentencia del Tribunal de Apelaciones que confirma la desestimación de la reclamación por despido por razón de discrimen político de un empleado transitorio dictada por el Tribunal de Primera Instancia. Mediante dicha sentencia el foro apelativo intermedio concluyó que el peticionario --empleado por contrato de una entidad creada por fondos gubernamentales determinados-- no tenía una expectativa legítima de continuidad en el empleo, por lo cual carecía de un interés en la retención del mismo, y que tampoco demostró la existencia de discrimen

político. Por los fundamentos que expondremos a continuación, confirmamos.

I

La Compañía de Fomento Industrial de Puerto Rico (en adelante Compañía de Fomento) es una corporación pública del Estado Libre Asociado de Puerto Rico con personalidad jurídica independiente y separada de éste y con capacidad para demandar y ser demandada, ello en virtud de las disposiciones de Ley Núm. 188 del 11 de mayo de 1942, según enmendada, conocida como la Ley de la Compañía de Fomento Industrial de Puerto Rico, 23 L.P.R.A. sec. 271, *et seq*. En virtud de la facultad delegada por la referida Ley,[1] esta corporación pública autorizó, mediante la Resolución Corporativa Núm. 86-53 de 12 de junio de 1986, la creación de una corporación subsidiaria sin fines de lucro llamada "Centro de Fomento de Empresas Para Jóvenes, Inc." (en adelante el Centro). Según el certificado de incorporación, dicha subsidiaria corporativa se creó para "[p]romover, organizar, administrar y desarrollar todo tipo de actividad económica con el objeto de crear nuevas fuentes de empleo"

---

[1] 23 L.P.R.A. sec. 278(l). Dicha sección dispone lo siguiente en cuanto a las facultades de la Compañía de Fomento: "obtener la organización de acuerdo con la ley y ejercer dominio parcial o total sobre compañías, asociaciones o corporaciones subsidiarias, con fines pecuniarios o no pecuniarios, afiliadas o asociadas, siempre que, a juicio de la Junta, tal arreglo sea necesario, apropiado o conveniente, para efectuar los fines de la Compañía o el ejercicio de sus derechos, poderes ..."

y para "[o]frecer adiestramientos y asesoramientos necesarios para crear nuevas fuentes de empleos en pequeñas empresas o negocios, cooperativas de bienes y servicios, talleres de servicios y/o de reparaciones y/o...cualquier tipo de actividad que genere empleo o autoempleo." (énfasis suplido). El Centro, como corporación subsidiaria, se regía por una Junta compuesta de no menos de tres directores y su único socio era la Compañía de Fomento. De los autos del caso surge que el primer año el Centro funcionó con fondos asignados por el Departamento del Trabajo. Ello en virtud de un contrato suscrito entre éste y el Centro al amparo de la Sección 10 (e) de la Ley Núm. 139 de 26 de junio de 1968, según enmendada por la Ley Núm. 82 de 3 de junio de 1980.[2] Transcurrido este año el Centro funcionó con fondos determinados asignados por la Asamblea Legislativa.

Por otro lado, el Programa del Cuerpo de Voluntarios al Servicio de Puerto Rico (en adelante el Cuerpo de Voluntarios) fue creado por la Ley Núm. 1 del 23 de junio de 1985, según enmendada, antes conocida como la Ley del Cuerpo de Voluntarios al Servicio de Puerto Rico, 18

---

[2] La referida disposición de ley autoriza al Secretario del Departamento del Trabajo a utilizar los fondos devengados del programa de beneficios por incapacidad para programas de adiestramiento y readiestramiento de empleados. Sección 10 (e) de la Ley Núm. 139 de 26 de junio de 1968, según enmendada por la Ley Núm. 82 de 3 de junio de 1980, 11 L.P.R.A. sec. 210 (e). De los términos del referido contrato surge que éste fue otorgado para asignar unos fondos iniciales al Centro para el adiestramiento de los empleados a contratar; por ello su vigencia fue de poco más de un año(entró en vigencia el 9 de junio de 1986 y permaneció vigente hasta el 31 de agosto de 1987).

L.P.R.A. sec. 1411, *et seq.*[3] Este programa tenía por objetivo el "desarrollar un programa vasto e innovador de actividades de formación del carácter y capacitación técnico-vocacional para el desarrollo integral de la juventud más necesitada del país . . . ." 18 L.P.R.A. sec. 1412. Otro de sus objetivos era el extender "un amplísimo programa de obras, servicios y acción comunal por los jóvenes participantes donde éstos contribuyan con su esfuerzo y trabajo a resolver problemas y mitigar necesidades de la comunidad en general..." *Ibid.*

El 15 de agosto de 1986, el Centro y el Cuerpo de Voluntarios suscribieron un acuerdo titulado "Contrato de Desarrollo Conjunto y Administración." Según estipularon las partes, el Programa de Autoempresas del Cuerpo de Voluntarios pasó a ser parte del Centro como resultado de tal contrato. Ello debido a los propósitos del Centro en relación con programas como el de Autoempresas. De este modo, el Centro administró el Programa de Autoempresas desde agosto de 1986 hasta el 1ro de julio de 1993, fecha en que cesó sus operaciones por falta de fondos. Debido al cierre del Centro, el Programa de Autoempresas volvió a ser parte de los múltiples programas que integraban al Cuerpo

---

[3] La Ley Número 224 del 6 de agosto de 1999 redenominó esta Ley como "Ley Orgánica de la Administración para el Adiestramiento de Futuros Empresarios y Trabajadores".

De igual forma, toda referencia al Programa del Cuerpo de Voluntarios al Servicio de Puerto Rico se sustituyó por la "Administración para el Adiestramiento de Futuros Empresarios y Trabajadores."

de Voluntarios. Antes de la disolución, el 26 de mayo de 1993, se les informó a sus ciento treinta y cinco (135) empleados que no se les renovaría el contrato, pero que se efectuaría una reevaluación de sus puestos para determinar cuáles de ellos serían trasladados para trabajar bajo el Programa de Autoempresas, el cual pasaría a funcionar dentro del Cuerpo de Voluntarios. De alrededor de ciento treinta y cinco (135) empleados, el Cuerpo de Voluntarios contrató setenta y dos (72) empleados.[4]

## II

Según las determinaciones de hecho realizadas por el Tribunal de Primera Instancia, el demandante, señor

---

[4] Algunos de estos empleados radicaron demanda alegando discrimen. El Tribunal de Primera Instancia declaró con lugar la demanda y ordenó la restitución de los empleados al encontrar que medió discrimen. El Tribunal de Circuito de Apelaciones consolidó ambos casos y revocó, al encontrar que la presunción de discrimen no quedó demostrada. Este Tribunal, luego de expedir el recurso de *Certiorari*, y mediante sentencia de 27 de abril de 2000, Rivera v. Estado Libre Asociado, Núm. CC-99-65, revocó al Circuito de Apelaciones, al concluir que medió discrimen político. En este caso se determinó que los empleados tenían una expectativa de continuidad de empleo. En específico, en dicha sentencia se indicó que en los contratos de empleo de los allí demandantes existía una cláusula donde el Centro se comprometía a retenerlos permanentemente. Bajo el entendido de que los demandantes conocían de la referida cláusula desde sus comienzos como empleados del Centro, y que la misma formaba parte de sus contratos de empleo, una mayoría de este Tribunal determinó que ello contribuyó a la formación de su expectativa de continuidad. Ello no obstante, y como detallaremos más adelante, aunque en el caso de marras existe una cláusula análoga, la misma no se encuentra en ninguno de los contratos de empleo del peticionario, sino en un contrato suscrito entre el Centro y el Departamento del Trabajo.

Giovanetti, estaba afiliado al Partido Popular Democrático y comenzó a trabajar para el Centro como parte del Programa de Adiestramiento y Empleo para Trabajadores Desplazados. La primera relación contractual entre el demandante y el Centro surgió bajo los términos del mencionado programa de adiestramiento. El aludido contrato entró en efecto el 16 de junio de 1986 con duración hasta el 31 de agosto de 1986. El demandante se desempeñó inicialmente como Director Regional del Centro para el área regional de Bayamón con un salario de $1,400.00 mensuales. Después de este primer contrato se otorgó el segundo por un año a partir del 1ro de septiembre de 1986, y así año tras año hasta el 30 de junio de 1993, que expiró luego que una nueva administración asumiera el control del Gobierno después de las elecciones de 1992, en las cuales resultó victorioso el Partido Nuevo Progresista (P.N.P.). Todos los contratos de empleo firmados entre el demandante-peticionario, señor Giovanetti, y el Centro <u>tenían términos fijos de un año</u>.

Así las cosas, el 26 de mayo de 1993, se le informó al señor Giovanetti que a partir del 1ro de julio de 1993 el Centro no recibiría más fondos para su operación, por lo que no se le renovaría el contrato. Al recibo de la antes mencionada comunicación el demandante le expresó a la Sub-Directora Ejecutiva del Cuerpo de Voluntarios, la señora Mirinda Y. Vicenty, su deseo de trabajar para esta entidad. El 1ro de junio de 1993, la señora Vicenty le comunicó al señor Giovanetti que habían evaluado su solicitud para

ingresar al Cuerpo y que la misma había sido considerada favorablemente. A tales fines fue referido a la oficina del señor Elí Martínez y recibió instrucciones de regresar a trabajar el 1ro de julio de 1993.

Llegado este día, el demandante se personó a la oficina del señor Elí Martínez. Pasada la mañana, el demandante recibió una llamada de un ayudante del Director Ejecutivo del Cuerpo de Voluntarios. Se le informó que se realizaría una evaluación de su puesto y se le notificaría el resultado dentro de un término de quince días, por lo que el demandante no debía volver a la oficina hasta que se le informara el resultado. Al finalizar tal periodo, la Sub-Directora le informó que no podía concederle de nuevo su plaza y le ofreció un puesto en el Registro de la Propiedad. El señor Giovanetti lo rechazó por no estar relacionado con su trabajo reciente.

En vista de lo anterior, el 23 de junio de 1994, el señor Giovanetti, su esposa, y la Sociedad Legal de Gananciales compuesta por ambos presentaron demanda ante el Tribunal de Primera Instancia, Sala Superior de San Juan. En síntesis, y en aquí lo pertinente, adujeron que las verdaderas razones para el despido del señor Giovanetti fueron de índole política. Además, alegaron que cierto contrato suscrito entre el Departamento del Trabajo y el Centro tuvo el efecto de crear puestos permanentes en el servicio de carrera para todos los empleados reclutados por el Centro.

Luego de los trámites de rigor, el juicio se realizó el 2 y 3 de octubre de 1996. Durante el mismo la parte demandante presentó un solo testigo, el aquí peticionario señor Giovanetti. Éste testificó sobre sus años de trabajo para el Centro. Declaró sobre las circunstancias en que no se le renovó su último contrato anual. Durante el juicio, los demandantes argumentaron que el señor Giovanetti era propiamente un empleado regular de carrera o, en la alternativa, que las circunstancias de su empleo le crearon una expectativa de continuidad en su empleo. Finalmente, los demandantes también argumentaron durante la vista en su fondo que el Centro y el Cuerpo de Voluntarios constituían una sola entidad y, por lo tanto, el Cuerpo de Voluntarios era responsable de cualquier incumplimiento o violación de ley por parte del Centro. A esos efectos invocaron la doctrina de descorrer el velo corporativo.

Por otro lado, la parte demandada presentó un único testigo, la señora María Dolores Santiago, quien figuraba en ese momento como Directora del Área de Desarrollo Económico del Cuerpo de Voluntarios. La señora Santiago declaró en torno a las diferencias en identidad entre el Cuerpo de Voluntarios y Centro y sobre las razones del cierre de este último.

Luego de analizar y evaluar toda la prueba presentada por las partes, el Tribunal de Primera Instancia declaró sin lugar la demanda radicada. Dicho foro determinó, como cuestión de hecho, que la disolución del Centro se debió,

estrictamente, a razones presupuestarias. Determinó que del testimonio de la Sra. Santiago surgía con meridiana claridad que la escasez de fondos fue la razón principal para el cierre del Centro. Resulta importante destacar que el tribunal de instancia encontró probado que una vez el Centro "dejó de existir", por falta de fondos, también "dejó de "existir" el puesto que ocupaba el señor Giovanetti; esto es, éste no fue sustituido por ninguna otra persona. Debe enfatizarse, por último, que el foro sentenciador determinó que el señor Giovanetti no probó que se le hiciera promesa alguna de permanencia en el empleo y/o de creársele una plaza de carrera y que, aun más importante, éste conocía plenamente el carácter transitorio del puesto que ocupaba, razón por la cual determinó que éste no tenía, ni existía, expectativa alguna de continuidad en su empleo.[5]

Inconformes, los demandantes, aquí peticionarios, acudieron ante el Tribunal de Apelaciones. El foro apelativo intermedio confirmó el dictamen del foro de instancia, por lo que los peticionarios acuden ante nos --vía *certiorari*-- imputándole al Tribunal de Apelaciones haber errado al:

> ...no descorrer el velo corporativo y como consecuencia de dicha negativa concluir que el señor Giovanetti trabajaba para el Centro y no para el Cuerpo de Voluntarios.

---

[5] El foro de instancia basó esta determinación en las propias declaraciones del señor Giovanetti y en los términos de los contratos que el mismo firmaba.

...concluir que el señor Giovanetti no tenía una expectativa razonable de permanencia en el empleo.

...concluir que no quedó demostrado el prejuicio por razones políticas.

Expedimos el auto. Contando con las comparecencias de las partes, y estando en condición de resolver, procedemos a así hacerlo.

III

La parte peticionaria alega, como primer señalamiento de error, que incidió el Tribunal de Apelaciones al negarse a descorrer el velo corporativo y, como consecuencia, concluir que el señor Giovanetti trabajaba para el Centro y no para el Cuerpo de Voluntarios. Invoca la parte peticionaria la doctrina de descorrer el velo corporativo, argumentando que siendo el Cuerpo de Voluntarios su verdadero patrono, éste debe responder por cualquier actuación incorrecta por parte del Centro. En síntesis aduce que la prueba documental y testifical desfilada ante el Tribunal de Primera Instancia demuestran que el patrono del señor Giovanetti era el Cuerpo de Voluntarios y no el Centro. No le asiste la razón. El Centro y el Cuerpo de Voluntarios no se pueden considerar la misma entidad porque la doctrina aludida no es de aplicación al presente caso y, además, porque existe prueba en el expediente que demuestra lo contrario. Veamos.

En el campo laboral, la doctrina de descorrer el velo corporativo (*álter ego*) se utiliza cuando una corporación toma control de otra entidad que usualmente desaparece, y se demuestra que ese cambio de mando tiene propósitos ilegales, constituye una violación a la política pública, se perpetuaría una injusticia o un fraude o se incumpliría con una obligación. El análisis en tal caso requiere que se demuestren propósitos o intentos de cometer actos ilegales. Véase: Rodríguez v. Banco Gubernamental de Fomento, res. el 19 de junio de 2000, 2000 TSPR 93; J.R.T. v. Asoc. C. Playa Azul I, 117 D.P.R. 20 (1986); J.R.T. v. Marex Const. Co., Inc., 103 D.P.R. 135 (1974). En este caso, el expediente no demuestra propósitos o intentos de cometer actuaciones ilegales; por el contrario, las actuaciones tanto del Centro como del Cuerpo de Voluntarios estaban autorizadas por las leyes habilitadoras correspondientes.

Por otro lado, el distintivo fundamental para que una corporación pública sea considerada subsidiaria de otra consiste en que el estatuto en virtud del cual existe la primera le imparta a ésta dicha característica y tenga personalidad jurídica propia. Rodríguez v. Banco Gubernamental de Fomento, ante. En el caso de autos, la Compañía de Fomento está facultada por su estatuto habilitador a obtener la organización y el dominio parcial o total sobre compañías, asociaciones o corporaciones subsidiarias, con o sin fines pecuniarios, siempre que a juicio de la Junta tal arreglo sea necesario, apropiado o

conveniente para efectuar los fines de la Compañía. 23 L.P.R.A. sec. 278(l). Es en virtud de esta facultad que la Compañía de Fomento creó el Centro, con personalidad jurídica propia y amplias facultades para ejecutar sus objetivos de crear nuevas fuentes de empleo y de autoempleo.

Asimismo, la Ley del Cuerpo de Voluntarios al Servicio de Puerto Rico, ante, facultaba al Cuerpo de Voluntarios a "ceder, sujeto a la aprobación del Gobierno del Estado Libre Asociado de Puerto Rico, cualesquiera fondos, propiedad, personal u otros recursos que estime conveniente para que dicha agencia se haga cargo de la administración de proyectos o programas establecidos de acuerdo a las disposiciones y los propósitos de [dicha ley]." 18 L.P.R.A. sec. 1441 (b).

En virtud de esta Ley es que el Cuerpo de Voluntarios y el Centro otorgaron un acuerdo de colaborar juntos. A esos efectos, el Artículo 13 de la referida Ley, 18 L.P.R.A. sec. 1441 (a), disponía que: "[e]l Programa podr[ía] utilizar, mediante convenio con cualquier agencia del Gobierno del Estado Libre Asociado de Puerto Rico ... cualesquiera fondos, propiedad personal u otros recursos que [fuesen] necesarios para realizar conjuntamente cualquier proyecto o actividad dentro de la encomienda del Programa establecido por [la ley]."

De lo expuesto anteriormente se colige que el Centro era una corporación subsidiaria creada por la Compañía de

Fomento. El señor Giovanetti contrató directamente con el Centro y, además, el Centro fue la entidad que inicialmente recibió fondos para la creación de empleos directamente del Departamento del Trabajo.

Por otro lado, tenemos que los objetivos y propósitos del Centro y el Cuerpo eran similares en ciertos aspectos, más no idénticos.[6] Por un lado, el Centro se dedicaba a crear nuevas fuentes de empleo, mientras el Cuerpo de Voluntarios se dedicaba a crear programas de capacitación técnico-vocacional y a preparar a la juventud para el autoempleo y el empleo remuneratorio. El hecho de que el Centro y el Cuerpo de Voluntarios tuviesen propósitos similares, y llegaran a un acuerdo de colaboración, no demuestra en forma alguna que ello se haya elaborado con el fin de defraudar o violentar la ley, o que ambas entidades constituyan una sola. Por el contrario, entendemos que la creación del Centro se debió a la disposición de fondos para ello. Luego de su creación, y conforme a su Ley habilitadora, el Cuerpo de Voluntarios aprovechó dicha situación para así delegar en el Centro la administración de uno de sus múltiples programas. Al surgir el recorte de fondos, el Centro dejó de existir y el programa pasó nuevamente a manos del Cuerpo de Voluntarios. Todo lo anterior se realizó de forma lícita.

---

[6] De las determinaciones de hecho realizadas por el tribunal de instancia no surge que éste haya encontrado que las funciones del Centro y el Cuerpo de Voluntarios fueran idénticas, ni similares.

En virtud de lo antes expuesto, concluimos que la doctrina de descorrer el velo corporativo <u>no</u> es de aplicación al presente caso[7] y, además, que el Centro y el Cuerpo de Voluntarios eran entidades distintas e independientes.

IV

Como segundo señalamiento de error alegan los peticionarios que erró el Tribunal de Apelaciones al concluir que el señor Giovanetti no tenía una expectativa razonable de continuidad en el empleo ya que las funciones y el tipo de trabajo que ejercía eran propias de un empleado permanente. Argumentan que las circunstancias particulares del caso son suficientes para crear en el señor Giovanetti una expectativa razonable de permanencia en el empleo. Aducen que, teniendo una expectativa de continuidad, el señor Giovanetti tenía un interés reconocido en la retención de su empleo. En tal virtud, alegan los peticionarios que dicho interés no podía serle

---

[7] Resulta preciso aclarar que existe otra doctrina, <u>no invocada por el peticionario</u>, la cual ha sido adoptada por este Tribunal para atender casos de obligaciones contraídas por patronos antecesores, cuando los patrones sucesores se niegan a acatar las mismas. Dicha doctrina es la del "patrono sucesor" (successorship). No obstante, entendemos que la misma no es de aplicación al caso de autos ya que no se ha demostrado que éste sea uno en que haya ocurrido una venta o transferencia de activos o una reorganización de un negocio. Tampoco se probó una similaridad sustancial en la operación de la empresa, ni continuidad en el identidad de la misma antes y después del cambio. Véase: <u>Piñeiro v. Int'l Air Serv. Of P.R., Inc.,</u> 140 D.P.R. 343 (1996).

privado sin un debido proceso de ley ni podía ser cesanteado sin seguirse las disposiciones del Reglamento de Personal aplicable a los empleados públicos. No les asiste la razón. Veamos porqué.

A

Reiteradamente hemos resuelto que un empleado público tiene un reconocido interés en la retención de su empleo, en tanto dicho interés esté protegido por ley, como ocurre con los empleados de carrera, o las circunstancias del empleo le creen una expectativa de continuidad. Depto. Recs. Naturales v. Correa, 118 D.P.R. 689, 693 (1987); García v. Mun. de Arroyo, 140 D.P.R. 750, 754 (1996). De existir este interés, la agencia nominadora tendría que seguir ciertos procedimientos para privar al empleado de su empleo, de forma que se cumpla con el debido proceso de ley. Perry v. Sindermann, 408 U.S. 593. 599 (1972). Además, tendría que acatar las disposiciones para cesantías establecidas en el Reglamento de Personal de la Administración Central. Veamos, en primer lugar, si el señor Giovanetti tenía un interés en la retención de su empleo protegido por ley.

La Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1301, *et seq.*,[8] aprobada el 14 de

---

[8] *Quare* si esta legislación es de aplicación a los empleados de la Compañía de Fomento Industrial, sus subsidiarias y a los empleados del antes existente Cuerpo de Voluntarios
(Continúa . . .)

octubre de 1975, según enmendada, establece dos categorías básicas de empleados públicos, a saber: empleados de carrera y empleados de confianza. 3 L.P.R.A. sec. 1349. La mayor diferencia entre estas dos categorías de empleados es que los primeros deben pasar por el proceso de reclutamiento y selección que detalla la antes mencionada Ley. 3 L.P.R.A. sec. 1333. Este tipo de empleado, una vez reclutado como empleado de carrera, goza de seguridad en el empleo y sólo puede ser destituido por justa causa y previo a ciertos trámites de rigor. 3 L.P.R.A. sec. 1336.

La Ley de Personal provee, además, para una tercera categoría de empleado, éstos son los llamados empleados transitorios. 3 L.P.R.A. secs. 1333(12) y 1336 (9). Al momento de la creación del Centro, en el año 1986, la Sección 4.3 (12) de la referida Ley, 3 L.P.R.A. 1333 (12), disponía lo siguiente: "[l]as personas nombradas en puestos de duración fija tendrán status transitorio. La duración de estos nombramientos corresponderá al período por el cual se cree el puesto. Podrán efectuarse nombramientos transitorios en puestos permanentes según se determine mediante reglamento."[9] (énfasis nuestro).

_____

(adscrito a la Oficina del Gobernador). Véase: 3 L.P.R.A. sec. 1338, donde se disponen las entidades excluidas de la Ley de Personal.

[9] A pesar de que la Ley Núm. 56 de 16 de agosto de 1989, 3 L.P.R.A. sec. 1333(12), enmendó en parte la Sección 4.3 (12) de la Ley de Personal, *ante*, la misma continuó disponiendo que "[l]as personas nombradas en puestos de duración fija tendrán *status* transitorio."(énfasis

(Continúa . . .)

Es importante señalar que en el año 1989 la Sección 4.2 de la Ley de Personal fue enmendada mediante la Ley Núm. 56 del 16 de agosto de 1989, 3 L.P.R.A. sec. 1332 (12), a los fines de aclarar y detallar la razón de ser de este tipo de empleado.[10] A tales efectos, el Inciso 12 de la mencionada sección actualmente dispone lo siguiente:

> Cuando surjan necesidades temporeras, de emergencia, imprevistas <u>o de una duración determinada</u> se crearán puestos de duración cuya vigencia no será mayor de veinticuatro (24) meses... Las agencias podrán crear puestos de duración fija por un período mayor de veinticuatro (24) meses, previa aprobación del Director; <u>en el caso de programas o proyectos de duración determinada financiados con fondos federales, estatales o combinados. En este último caso, los puestos se podrán extender por la duración del programa o proyecto.</u> 3 L.P.R.A. sec. 1332 (12). (énfasis nuestro).

La Exposición de Motivos de la Ley Núm. 56, *ante*,[11] dispone lo siguiente en cuanto a los motivos de las enmiendas antes discutidas:

> <u>Los nombramientos transitorios de duración fija corresponden al periodo para el cual se cree el puesto</u>. Este mecanismo debe utilizarse en situaciones imprevistas o de emergencia, tales como aumentos periódicos en el volumen de

_____

nuestro). Dicha Ley enmendó, además, el inciso 13 de esta Sección 4.3, *ante*, a los fines de establecer que "[l]os nombramientos transitorios en puestos de duración fija se efectuar[ían] por el período por el cual se cre[ara] el puesto... Dichos nombramientos no podrán exceder de veinticuatro (24) meses, <u>excepto en los puestos autorizados para programas o proyectos de duración determinada</u>."

[10] De esta forma se añadió el Inciso doce (12). De igual forma, la Ley Núm. 3 del 29 de diciembre de 1989 sustituyó "dieciocho (18) meses" por "veinticuatro (24) meses".

[11] P. de la C. 445, Ley Núm. 56 del 16 de agosto de 1989.

trabajo, sustitución de empleados en licencia con paga, en el inicio de nuevos programas o necesidades mientras se crean puestos, y proyectos especiales de duración determinada. (énfasis nuestro).

A tono con tal intención legislativa podemos concluir que mediante la aprobación de la Ley Núm. 56, *ante*, la Asamblea Legislativa tuvo el propósito de aclarar que los puestos transitorios pueden ser utilizados, no sólo para necesidades temporeras, de emergencia o imprevistas, sino también para proveer flexibilidad en la creación de empleos en programas creados con fondos particulares, con los cuales no se contará indefinidamente.[12]

En resumen, y en vista del término fijo del contrato de empleo del señor Giovanetti, así como de las

---

[12] Así lo reconoció el Tribunal Federal de Apelaciones para el Primer Circuito en Arbona Torres v. Aponte Roque, 831 F. 2d 26, 27-28 (1er Cir., 1987). Dicho foro judicial, al reconocer el uso de empleados transitorios en entidades que funcionan con fondos asignados en forma determinada, ya que dependen de la asignación de los mismos para su funcionamiento, expresó:

> Because the School Lunch Program ("Program") is financed entirely with federal funds, the amount of which may vary from year to year, plaintiffs were among the hundreds of Program employees who receive "transitory," one-year appointments that are renewed as a matter of course if funding permits. Such transitory employees are to be distinguished from career employees, who must compete for their positions but who may only be discharged for cause. The use of transitory employees thus gives the Program more flexibility to reduce its workforce in the event of a cutback in federal funding. The arrangement also saves the Program the expense of contributing to the more generous benefits enjoyed by career employees.(énfasis nuestro).

circunstancias en que su empleo fue creado, concluimos que éste ostentaba un nombramiento de carácter transitorio. Durante un periodo de siete años el señor Giovanetti estuvo año tras año firmando contratos de empleo donde se estipulaba expresamente cuál sería el término de duración de su contrato de empleo, disponiéndose claramente una fecha de comienzo y una de terminación del mismo. Hemos realizado un estudio minucioso de cada uno de estos contratos y estamos convencidos de que en ninguno de ellos se le ofreció al señor Giovanetti algo más que un nombramiento de carácter transitorio.

Ahora bien, lo anteriormente expuesto no dispone completamente del asunto ante nos, es necesario que determinemos, además, si los empleados transitorios tienen, o no, un interés en la retención de su empleo que esté reconocido por ley. La respuesta a esta interrogante es en la afirmativa, aunque, únicamente, durante la duración de su nombramiento. Veamos.

El Reglamento de Personal de la Administración Central, sec. 7.9, claramente establece que los empleados con nombramiento transitorio no se consideran empleados de carrera. Igualmente indica que ninguna persona que haya recibido nombramiento de ese tipo puede ser nombrada a desempeñar puestos en el servicio de carrera a no ser que pase por el proceso de reclutamiento y selección que establece la Sección 4.3 de la Ley de Personal, ante. Reglamento de Personal, ante. Cf. Depto. Recs. Naturales v.

Correa, *ante,* a la pág. 695.   Véase además: 3 L.P.R.A. sec. 1333 (14).

No obstante lo anterior, este Tribunal ha reconocido que los empleados transitorios gozan de una expectativa de retención de empleo durante el término de su nombramiento mas no cuando el mismo ha vencido. A esos efectos en Dept. Recs. Naturales v. García, *ante,* a la pág. 697, expresamos que:

> Examinada la Ley de Personal, el reglamento y el historial legislativo de esa medida, concluimos que un nombramiento transitorio genera expectativa de retención en el empleo *sólo* durante el término del nombramiento. Ante el claro mandato legislativo, resulta inescapable concluir que bajo las disposiciones de la Ley de Personal del Servicio Público un empleado transitorio no goza de derecho a permanencia en su puesto ni tiene expectativa legítima de retención en el mismo una vez vencido el nombramiento. (citas omitidas y énfasis suplido).

Debido a que la expectativa de retención de empleo de un empleado transitorio se extiende únicamente durante la duración de su nombramiento, de ser cesanteado dentro del mismo, la autoridad nominadora viene obligada a seguir los procedimientos de la Sección 9.3 del Reglamento de Personal, *ante.* Ello obedece a que el principio de mérito cobijado por dicha Sección abriga a todos los empleados públicos y a que la retención de empleo es un área esencial del mérito.

Ahora bien, cuando un nombramiento transitorio vence y el mismo  no se le extiende al empleado nuevamente, ya no existe la expectativa de retención. Por tal razón, la

agencia nominadora no adviene obligada a seguir los procedimientos de la Sección 9.3 del Reglamento de Personal, *ante,* cuando decide no renovar un nombramiento transitorio.[13] Cónsono con lo anterior en Depto. Recs. Naturales v. Correa, ante, a la pág. 700, concluimos que "[e]xpirado el término de un nombramiento transitorio, la agencia no viene obligada a demostrar justa causa para no renovar el nombramiento." (énfasis suplido).

En virtud de lo anterior, resulta inescapable la conclusión de que la ley no le reconoce un interés en la retención de empleo al señor Giovanetti. Ello no obstante, debemos examinar si las circunstancias de su empleo le crearon una expectativa de continuidad. De ser ello así, el señor Giovanetti tendría un interés en la retención de su empleo y, por tanto, estaría protegido por el debido proceso de ley y las disposiciones de cesantías antes mencionadas.

B

Tal y como señaláramos anteriormente, el Centro para el cual trabajaba el peticionario fue creado por la Compañía de Fomento Industrial. Dicho Centro funcionaba de acuerdo a ciertos fondos asignados anualmente. De esta

---

[13] Recordemos que abstenerse de extender un nuevo nombramiento transitorio no constituye una suspensión o destitución. Véase: Depto. Recs. Naturales v. Correa, ante; Martínez v. Colom, Comisionado del Interior, 51 D.P.R. 417, 421 (1937). Véase además: 3 L.P.R.A. sec. 1336 (6(a).

asignación de fondos dependía directamente, no sólo la contratación de los empleados del Centro, sino también la propia existencia del mismo. Es por ello que en cada uno de los contratos suscritos entre el Centro y sus empleados se hacía referencia a la procedencia de los fondos en virtud de los cuales se realizaba la contratación. El señor Giovanetti leyó y firmó cada uno de estos contratos, razón por la cual debemos razonablemente presumir que conocía sobre la fragilidad de su puesto. No podemos perder de perspectiva el hecho de que Giovanetti contaba con una preparación en Derecho, la cual lo colocaba en una posición privilegiada al momento de analizar e interpretar cada una de las cláusulas de los contratos por él firmados.[14]

Asimismo, el peticionario tenía pleno conocimiento de la duración fija de su puesto y de su carácter transitorio. A esos efectos, el tribunal de instancia indicó en su sentencia que: "[d]esde el comienzo de su relación contractual el Sr. Giovanetti estaba consciente del carácter transitorio de sus nombramientos. En todos los contratos claramente se establecía la duración de los mismos por un término de un año." (énfasis nuestro). Más aún, de la Exposición Narrativa de la Prueba se desprende que el señor Giovanetti firmaba contratos anuales,

---

[14] Surge de los autos que el señor Giovanetti fue admitido por este Tribunal al ejercicio de la abogacía el 4 de enero de 1974 y al del notariado el 16 de enero de 1975.

conociendo que éstos se extendían por un término fijo. Además, surge que éste visitó personalmente a varios legisladores con el propósito de cabildear para que su puesto, y el de otros empleados, se convirtieran en permanentes. Evidentemente el peticionario conocía que su empleo era uno con status transitorio por lo que no puede sostener válidamente que tenía una expectativa real de que su nombramiento podía tener permanencia. A esos mismos efectos, en Dept. Recs. Naturales v. Correa, ante, a la pág. 694, reiterado por Orta v. Ayala, ante, a la pág. 245, expresamos:

> Por el contrario, el recurrido era consciente de que la plaza que ocupaba era una transitoria, y a término fijo. El que ostenta un nombramiento transitorio, con el conocimiento de que el mismo vence transcurrido el término para el cual fue expedido, no puede sostener válidamente que tiene una expectativa real de que dicho tipo de nombramiento le brinda permanencia en su empleo o derecho a que el mismo se le extienda constantemente.

Por otro lado, los peticionarios argumentan que la renovación continua del contrato de empleo del señor Giovanetti aportó a su alegada expectativa de retención de empleo. Hemos resuelto, sin embargo, que "el mero hecho de ocupar una posición por un prolongado periodo de tiempo no crea por sí solo un interés propietario...". Orta v. Ayala, ante; Dept. Recs. Naturales v. Correa, ante, a la pág. 699, citando a Morales Narváez v. Gobernador, 112 D.P.R. 761, 768 (1982).

Más aún, y como señaláramos anteriormente, el peticionario no demostró que se le hiciera promesa alguna de permanencia, o de obtener un puesto de carrera. Y, de existir dicha promesa, de todos modos la misma sería insuficiente para crear una expectativa de continuidad en el empleo. Depto. Recs. Naturales v. Correa, ante, a la pág. 699. Sobre ese punto, el tribunal de instancia correctamente expresó que: "[e]n primer lugar, no se demostró que se le hubiere ofrecido un puesto de carrera y aun de haber existido tal promesa no se demostró como en el caso de Lupiáñez que se hubiese efectuado un trámite dirigido a efectivamente concederle la permanencia."

A tenor con lo expresado anteriormente, resolvemos que el peticionario, señor Giovanetti, ocupaba un puesto transitorio y las circunstancias de su empleo no ameritan que se reconozca una expectativa legítima de continuidad en el mismo. Resolvemos, además, que al no renovársele su contrato no se tenían que seguir las disposiciones de cesantías dispuestas en el Reglamento de Personal ni tampoco se le violó su debido proceso de ley.

Por último, resulta importante destacar que en el caso de autos el señor Giovanetti ocupó su puesto hasta finalizado su contrato y, entonces, el mismo dejó de existir ya que por acción legislativa se eliminó la asignación de fondos. Incluso, la entidad para la que trabajaba fue disuelta en su totalidad. Por esta razón, entendemos que no existe realmente un interés propietario

del que se le haya privado al peticionario, señor Giovanetti, sin un debido proceso de ley. De existir un interés propietario, el mismo dejó de existir una vez el Centro cesó sus funciones por falta de fondos y el puesto transitorio que ocupaba desapareció.[15]

C

Por otro lado, los peticionarios argumentan que la cláusula quinta del contrato suscrito entre el Departamento del Trabajo y el Centro tuvo el efecto automático de crear

---

[15] En el caso de Vargas v. Barceló, 385 F. Supp. 879 (D. P.R. 1974), confirmado en Muñoz Vargas v. Romero Barceló, 532 F. 2d 765 (1er Cir., 1976), la Corte Federal para el Distrito de Puerto Rico resolvió que era muy distinto un reclamo de debido proceso de ley cuando una persona es despedida, o no se le renueva un contrato, a cuando un puesto que ocupa un empleado deja de existir. A esos efectos la corte de distrito indicó:

> In a case in which executive action is taken to terminate an individual from a job in which he has a property interest, the courts can and will require that such an interest not be taken without due process of law. *Perry v. Sindemann*, 408 U.S. 593 (1972). In such a case, the individual is afforded notice, an evidentiary hearing and reasons for the action taken.
>
> However, the case at bar in which certain jobs were eliminated by legislative action is obviously different. The 'process' which was 'due' in this case was simply that the legislation in question be duly enacted and executed…but the court is aware of no reason or authority why as a matter of procedural due process elected representatives should have to otherwise justify their decision to the individuals holding public jobs which are eliminated.

puestos permanentes en el servicio de carrera para todos los empleados a ser contratados.[16] En tal virtud, argumentan que el señor Giovanetti era propiamente un empleado regular de carrera. No les asiste la razón. Veamos.

En primer lugar, es importante recordar que al momento en que se firmó el contrato aquí en controversia, la Ley de Personal, ante, disponía para tres tipos de empleados: los de confianza, los transitorios y los de carrera. Somos del criterio que si la intención de las partes hubiese sido que los puestos que creara el Centro fueran, automáticamente, regulares en el servicio de carrera, así se hubiese dispuesto expresamente en el contrato.

Sobre este particular el Artículo 1233 del Código Civil, 31 L.P.R.A. sec. 3471, dispone que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas." Asimismo, el Artículo 1235 del Código Civil, 31 L.P.R.A. sec. 3473, establece que "[c]ualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquellos sobre que los interesados se propusieron contratar." (énfasis nuestro).

---

[16] Cabe señalar que el peticionario no arguye que la referida cláusula le haya creado algún tipo de expectativa de retención en el empleo.

El contrato aquí en controversia disponía claramente que "El 'PATRONO' se compromet[ía] a retener permanentemente en el empleo a la persona por la cual [hubiese] recibido el subsidio salarial, después de finalizar la fecha de vigencia del contrato, excepto en los casos en que haya justa causa para no retenerlo, conforme a la legislación laboral." (énfasis nuestro). Es de advertir que en ningún momento las partes pactaron que los puestos a ser creados por el Centro para los empleados cuyos sueldos subvencionó el Departamento del Trabajo serían en el servicio de carrera. Esto es, la cláusula en cuestión no tuvo el efecto de crear *ipso facto* un puesto permanente en el servicio de carrera para Giovanetti. Dicha interpretación sería contraria a los claros términos del contrato ante nos.

Ahora bien, sin lugar a dudas, la cláusula en cuestión sí podría ser interpretada como una a favor de terceros. Véase: Artículo 1209 del Código Civil, 31 L.P.R.A. sec. 3374; Bco. Central Corp. v. Yauco Homes, Inc., 135 D.P.R. 858 (1994). Ello no obstante, debe quedar claro que la obligación contractual del Centro se enfocaba en retener a los empleados para los cuales recibió el subsidio salarial inicial, subsidio que fue la razón medular del contrato, y no en otorgar puestos permanentes en el servicio de carrera. La razón es sencilla: se trataba de unos puestos que dependían de asignaciones económicas anuales para las cuales no existía seguridad alguna ni certeza de ser

recibidas. El Centro no podía comprometerse a otorgar a los empleados adiestrados puestos permanentes de carrera, pues su existencia era incierta. A lo único que podía obligarse era a lo que en efecto se obligó, a <u>retener</u> esos empleados por todo el tiempo que durara su existencia.

En conclusión, conforme los hechos del caso ante nuestra consideración, el Centro cumplió cabalmente con lo estipulado en el contrato aquí en controversia <u>al retener</u> al señor Giovanetti en su empleo <u>hasta que, por razón de falta de fondos, se vio en la necesidad de no renovarle su contrato</u>. La falta del subsidio, o de los fondos provistos, <u>constituye la justa causa</u> de que habla la antes citada cláusula quinta. Queda claro, entonces, que Giovanetti no tiene derecho alguno a exigir un puesto permanente en el servicio de carrera que su patrono nunca se obligó a otorgar y en relación con el cual él nunca tuvo expectativa de continuidad.

V

Como último error, aducen los peticionarios que quedó demostrado el prejuicio por razones políticas porque durante el juicio en su fondo desfiló evidencia suficiente a esos efectos. Argumentan que tanto el tribunal de instancia como el de apelaciones erraron al no concluir que la presunción de discrimen, según reconocida en <u>Orta v. Padilla Ayala</u>, *ante*, quedó establecida. Tampoco les asiste la razón. Veamos porqué.

La Sección 1 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico prescribe en forma clara que "no podrá establecerse discrimen alguno por motivo de raza, color, ... ideas políticas o religiosas". Debido al lenguaje terminante de esta Sección, en reiteradas ocasiones, hemos reconocido que no cabe el discrimen político contra un empleado público, incluyendo tanto los de confianza, los irregulares como los transitorios. Aponte Burgos v. Aponte Silva, res. el 7 de mayo de 2001, 2001 TSPR 66; Alberty v. Bco. Gub. de Fomento, 149 D.P.R. 655 (1999).

Ahora bien, un empleado transitorio sólo tendrá un remedio ante los tribunales por un reclamo de despido por discrimen político si las razones por las cuales fue despedido son exclusivamente políticas. Es decir, si la agencia nominadora puede demostrar, mediante preponderancia de la prueba, que el contrato no se renovó por otras razones, entonces, no cabe hablar de un remedio por discrimen político. Aponte Burgos v. Aponte Silva, ante. Estas razones pueden ser: i.) la falta de fondos; ii.) el desempeño inadecuado del empleado en cuanto a sus funciones se refiere; o iii.) cualquier otra razón justificada. Ibid.

En el caso de autos el peticionario no presentó prueba demostrativa alguna de que fuese despedido por su afiliación política. Por el contrario, de los autos surge que luego de informársele que el Centro sería disuelto por falta de fondos fue considerado para un puesto en el Cuerpo

de Voluntarios e incluso se le ofreció un puesto regular en el Registro de la Propiedad que éste no aceptó. Más aún, el peticionario <u>no</u> demostró que existiera un puesto igual al que él ocupaba en el Centro y, mucho menos, que haya sido sustituido por alguien de una afiliación política diferente. Sobre este punto, el foro de instancia expresó:

> El demandante no presentó prueba demostrativa de que fue suspendido por su afiliación política. Por el contrario, fue llamado con posterioridad al vencimiento de su contrato para ser evaluado para un puesto en el Cuerpo de Voluntarios. En efecto se le ofreció un puesto de Registrador de la Región de San Juan. El motivo de la no renovación del contrato fue la disolución del Centro por lo que el puesto que ocupó el Sr. Giovanetti dejó de existir y no fue sustituido por alguien ya fuera de igual o de diferente afiliación política. <u>Orta v. Ayala</u>, *supra*.

De hecho, de los autos surge claramente que entre los reclutados por el Cuerpo de Voluntarios, una vez disuelto el Centro, se encontraban personas identificadas con todas las ideologías políticas, incluso partidarios del Partido Popular Democrático.

En cuanto al cierre del Centro por razones presupuestarias y de política pública, el tribunal sentenciador entendió que ello quedó demostrado por el testimonio de la señora María Dolores Santiago, quien en esos momentos se desempeñaba como Directora del Área de Desarrollo Económico del Cuerpo de Voluntarios. Sobre ello, el tribunal sentenciador expresó que "quedó demostrado que la determinación de la disolución del Centro fue una fundada en razones presupuestarias y de política pública."

En vista de que el peticionario era un empleado transitorio, y existía una causa justificada para no renovársele el contrato, no cabe hablar de despido por discrimen político en este caso.

A esos efectos, debemos recordar la norma de deferencia que deben tener los foros apelativos en cuanto a las determinaciones de hecho y la apreciación de la prueba que realiza un tribunal de instancia. En ausencia de pasión, prejuicio, error manifiesto o parcialidad este Tribunal no intervendrá con las determinaciones de hecho y la apreciación de la prueba que realizan los foros de instancia. Trinidad García v. Chade, res. el 18 de enero de 2001, 2001 TSPR 7; Arguello López v. Arguello García, res. el 31 de agosto de 2001, 2001 TSPR 124. En el caso de autos, el tribunal sentenciador no actuó con prejuicio, pasión o parcialidad y tampoco cometió error manifiesto, razón por la cual no debemos intervenir con sus determinaciones. Al contrario, un examen sereno y minucioso de los autos nos convence de que la determinación del foro de instancia fue una racional, justiciera y jurídica.

Procede la confirmación de la sentencia recurrida.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro J. Giovanetti y la SLG
compuesta por el y su esposa
María de los Ángeles Lugo

    Demandantes-peticionarios

        vs.                         CC-1999-64     CERTIORARI

Estado Libre Asociado de Puerto
Rico, Centro de Fomento de
Empresas para Jóvenes, Inc. y
Compañía de Fomento Industrial
de Puerto Rico

    Demandados-recurridos

SENTENCIA

San Juan, Puerto Rico, a 29 de marzo de 2004

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida en el presente caso por el Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo La Juez Presidenta señora Naveira Merly concurre en el resultado sin opinión escrita. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo