EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Adventist Health System Corp.<br><br>    Peticionaria<br><br>        v.<br><br> Lourdes Mercado Ortiz<br><br>    Recurrida | Certiorari<br><br>2007 TSPR 100<br><br>171 DPR ＿＿＿ |

Número del Caso: CC-2005-1229

Fecha: 30 de mayo de 2007

Tribunal de Apelaciones:

> Región Judicial de Ponce Panel X

Juez Ponente:

> Hon. German J. Brau Ramírez

Abogado de la Parte Peticionaria:

> Lcdo. José A. Oliveras González

Abogado de la Parte Recurrida:

> Lcdo. Rafael Fabre Carrasquillo

Materia: Reclamación por Despido Injustificado

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Adventist Health System Corp.

   Peticionaria

        v.                   CC-2005-1229     Certiorari

Lourdes Mercado Ortiz

   Recurrida

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico a 30 de mayo de 2007.

En esta ocasión, debemos determinar si los empleados despedidos sin justa causa por una entidad privada que adquirió una facilidad de salud dentro del esquema contemplado en la Ley de Privatización de Instituciones de Salud, Ley Núm. 190 de 5 de septiembre de 1996, según enmendada, (en adelante, Ley Núm. 190) tienen derecho a que se les tomen en cuenta –para efectos del cómputo de la mesada– los años de servicio prestados en el Departamento de Salud del Estado Libre Asociado antes de la privatización. Respondemos dicha interrogante en la negativa.

I

La Sra. Lourdes Mercado Ortiz (en adelante, señora Mercado Ortiz) trabajó para el Gobierno de

Puerto Rico desde el año 1981 en el Hospital de Área Tito Mattei de Yauco (en adelante, el Hospital). En el año 1998, el Departamento de Salud le vendió las facilidades del Hospital a Adventist Health System Corp., corporación que se dedica, entre otras cosas, a la prestación de servicios médico-hospitalarios.

Tras celebrarse el contrato, Adventist Health continuó operando el Hospital a través de la subsidiaria Hospital Bella Vista del Suroeste, Inc. y reclutó algunos de los empleados que trabajaban para el Departamento de Salud, entre ellos, la señora Mercado Ortiz. No obstante, el 27 de septiembre de 2001, Adventist Health despidió a esta última. Así las cosas, la señora Mercado Ortiz presentó una demanda contra Adventist Health sobre despido injustificado al amparo de la Ley Núm. 80 de 30 de mayo de 1976, solicitando el pago de la mesada correspondiente, en cuyo cómputo incluyó los años trabajados para el Departamento de Salud.

Adventist Health contestó la demanda y, tras otros incidentes procesales, presentó una moción de sentencia sumaria parcial. Solicitó que se dictase sentencia sumaria parcial a los fines de establecer que, en caso de que la señora Mercado Ortiz prevaleciera en su reclamación de la mesada, no se tomarían en cuenta los años que trabajó para el Departamento de Salud, toda vez que la figura del patrono sucesor resulta inaplicable a los hechos de este caso.

La señora Mercado Ortiz, por su parte, se opuso a los argumentos de Adventist Health. En específico, alegó que dicha entidad es patrono sucesor del Departamento de Salud, por lo que aplica el Art. 6 de la Ley Núm. 80, supra, que ordena que en el cómputo de la mesada se acrediten los años de servicio prestados por un empleado que es retenido por el adquirente de un negocio en marcha. Asimismo, sostuvo que la Ley Núm. 190, supra, que provee cierta inmunidad a favor de los adquirentes de las facilidades privatizadas, no tiene el alcance de impedir que se consideren los años trabajados para el Departamento de Salud.

El tribunal de instancia emitió una Resolución en la que concluyó que, por imperativo de la Ley Núm. 190, supra, Adventist Health no se convirtió en patrono sucesor del Departamento de Salud y que, por ende, el Art. 6 de la Ley Núm. 80, supra, no aplica a los hechos de este caso. En vista de ello, determinó que –para efectos del cómputo de la mesada– no procede tomar en cuenta los años que la señora Mercado Ortiz trabajó para el Departamento de Salud.

Insatisfecha, la señora Mercado Ortiz acudió ante el Tribunal de Apelaciones, el cual revocó la determinación. Dicho foro concluyó que los años de servicio prestados por un empleado a favor del Gobierno antes del proceso de privatización, no constituyen el tipo de hecho o evento por el cual la Ley Núm. 190, supra, le concede inmunidad

al adquirente de la facilidad privatizada. El foro apelativo basó su dictamen, además, en el hecho de que la Ley Núm. 80, supra, constituye un estatuto reparador que debe ser interpretado liberalmente a favor del empleado, ello en contraposición con la inmunidad concedida en la Ley Núm. 190, supra. Así, basándose en la jerarquía entre ambos estatutos, el foro apelativo concluyó que deben prevalecer las disposiciones de la Ley Núm. 80, supra.

Adventist Health acude ante nos aduciendo que erró el foro apelativo al determinar que un ex-empleado público, que fue retenido por una empresa privada que compró una instalación de salud pública, retiene los años de servicio que le brindó al Gobierno y que éstos son oponibles ante el patrono privado para fines del cómputo de la mesada.

Vista la petición, acordamos expedir. La señora Mercado Ortiz no ha comparecido a presentar su alegato. Por tanto, resolvemos sin el beneficio de su comparecencia.

II

A

El Art. 1 de la Ley Núm. 80, supra, dispone que "[t]odo empleado de comercio, industria o cualquier otro negocio o sitio de empleo,[…] donde trabaja mediante remuneración de alguna clase contratado sin tiempo determinado, que fuere despedido de su cargo sin que haya

mediado justa causa, tendrá derecho a recibir de su patrono, en adición al sueldo que hubiere devengado…" una indemnización comúnmente llamada la mesada, que se computa a base de la cantidad de años de servicio rendidos para el patrono. 29 L.P.R.A. Sec. 185a.

Por su parte, el Art. 6 del referido estatuto dispone –en lo pertinente– que "[e]n el caso del traspaso de un negocio en marcha, si el nuevo adquirente continúa utilizando los servicios de los empleados que estaban trabajando con el anterior dueño, se les acreditará a éstos el tiempo que lleven trabajando en el negocio bajo anteriores dueños". 29 L.P.R.A. Sec. 185f.

Basándose en esta última disposición y en la doctrina del "patrono sucesor", la señora Mercado Ortiz alega que en el cómputo de la mesada a la que pudiera tener derecho, se tiene que tomar en consideración los años que ésta trabajó para el Departamento de Salud. Por su parte, Adventist Health sostiene que la disposición aludida no aplica a los hechos de este caso, toda vez que la inmunidad concedida en la Ley Núm. 190, supra, así lo impide. Veamos.

Primero, conviene tener presente que las protecciones concedidas por la Ley Núm. 80, supra, están dirigidas esencialmente a los empleados de la empresa privada. Así surge del texto mismo del estatuto, en el cual se hace referencia mayormente a entidades de índole comercial y empresarial, tales como comercios, industrias

y negocios. Véase 29 L.P.R.A. Sec. 185a. En los artículos subsiguientes se menciona, incluso, a "empresas que tienen varias oficinas, fábricas, sucursales y plantas […]" (Énfasis suplido), 29 L.P.R.A. Sec. 185c. De hecho, el historial legislativo de la Ley Núm. 80, supra, nos muestra que el legislador pretendía que las disposiciones de la Ley protegieran a "los empleados de comercio, industria o cualquier otro negocio lucrativo que estén contratados sin tiempo determinado contra la eventualidad de ser despedidos de su cargo sin justa causa […]". Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes sobre P. del S. 1112 de abril de 1976.

Si tomamos en consideración el lenguaje de la Ley, el historial legislativo y, a su vez, tenemos presente que el Departamento de Salud es una agencia de la Rama Ejecutiva[1] y no un negocio o empresa privada, debemos concluir que las disposiciones de la Ley Núm. 80, supra, no se extienden a las relaciones laborales entre dicha entidad y sus empleados[2].

---

[1] El Departamento de Salud es una agencia del Gobierno del Estado Libre Asociado de Puerto Rico que tiene a su cargo todos los asuntos que por ley se le encomienden relacionados a la salud, sanidad y beneficencia pública. Véase Ley Núm. 81 de 14 de marzo de 1912, según enmendada, 3 L.P.R.A. Sec. 171 et seq.

[2] El Departamento del Trabajo y Recursos Humanos también entiende que la Ley Núm. 80, supra, no cubre a los empleados de Gobierno. No obstante, considera que las disposiciones de la Ley protegen a los empleados de las corporaciones públicas que funcionan como empresas privadas. Departamento del Trabajo y Recursos Humanos,

Ya desde Rodríguez Cruz v. Padilla Ayala, 125 D.P.R. 486 (1990), nos habíamos referido a dicho estatuto como una legislación protectora del empleado de la esfera privada, de forma contrapuesta a la normativa que cobija a los empleados públicos[3]. Dicho análisis también lo dimos por cierto recientemente en Prudencio v. Municipio de San Juan, res. el 2 de febrero de 2007, 2007 TSPR 19, nota núm. 7. Y es que, precisamente, la distinción entre el empleo público y el empleo privado es lo que explica la inaplicabilidad de la Ley Núm. 80, supra, en contextos como el que nos ocupa. Dicha distinción está basada, entre otras cosas, en el hecho de que el empleado público tiene un reconocido interés en la retención de su empleo, en tanto dicho interés esté protegido por ley (como el caso del empleado de carrera[4]) o cuando las

_____

*Guía Revisada para la aplicación de la Ley Núm. 80,* pág. 24. A pesar de ello, en esta ocasión no nos corresponde expresarnos en cuanto a la extensión de la Ley Núm. 80, supra, a ese tipo de entidad, toda vez que ese asunto no se encuentra ahora ante nuestra consideración.

[3] En específico, indicamos que "[…] a diferencia del caso de la acción por razón de despido injustificado que le concede al empleado de la **empresa privada** la Ley Núm. 80 de 30 de mayo de 1976 ––al amparo de la cual el remedio que, de ordinario, se concede lo es el pago de la "mesada"–– aquí [situación de despido de un empleado público] se trata de una conducta que viola un mandato expreso de nuestra Constitución, con el agravante de que es el Estado el violador, el cual se supone sea el primero en defender los derechos constitucionales de nuestra ciudadanía", Rodríguez Cruz v. Padilla Ayala, supra, pág. 524, (énfasis suplido).

[4] Los empleados de carrera "[s]on aquellos que han ingresado al servicio público en cumplimiento cabal de lo establecido por el ordenamiento jurídico vigente y aplicable a los procesos de reclutamiento y selección del

circunstancias crean una expectativa de continuidad. Giovannetti v. E.L.A., res. el 29 de marzo de 2004, 2004 TSPR 46; García v. Mun. de Arroyo, 140 D.P.R. 750 (1996). De existir tal interés, la entidad gubernamental de que se trate tiene que seguir ciertos procedimientos para privar al empleado de su puesto, de forma tal que se cumpla con todas las garantías del debido proceso de ley. Giovannetti v. E.L.A, supra.

Las protecciones aludidas emanan de la Ley de Personal del Servicio Público, hoy Ley de la Administración de Recursos Humanos, Ley Núm. 184 de 3 de agosto de 2004. Conforme a dicha legislación, los empleados públicos son seleccionados, ascendidos, retenidos y tratados en todo lo referente a su empleo en base al principio de mérito; esto es, sobre la base de su capacidad, sin discrimen por razón de raza, color, sexo, nacimiento, edad, origen, condición social, ideas políticas, religiosas, condición de veterano o impedimento físico o mental. 3 L.P.R.A. Sec. 1461(41).

A tenor con esta normativa, los empleados de carrera gozan de seguridad en el empleo, siempre que satisfagan los criterios de productividad, eficiencia, hábitos, actitudes, orden y disciplina que deben prevalecer en el servicio público. En vista de ello, dichos empleados sólo pueden ser destituidos por justa causa, previa

---

servicio de carrera al momento de su nombramiento. Tales empleados tienen derecho a permanecer en el servicio conforme se dispone en la sec. 1462e de este título". 3 L.P.R.A. Sec. 1465(1).

formulación de cargos y apercibimiento de su derecho a solicitar una vista previa. 3 L.P.R.A. Sec. 1462, 1462e(4). Además de lo anterior, los empleados cobijados por esta Ley cuentan con un foro que revisa cualquier determinación que afecte sus derechos al amparo de la misma, a saber, la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Público [antes Junta Apelativa del Sistema de Administración de Personal], la cual -entre otras cosas- **puede ordenar su reposición en el empleo**. 3 L.P.R.A. Sec.1468(l), 1468h(9).

En vista de lo anterior, debemos concluir que el legislador no extendió las protecciones de la Ley Núm. 80, supra, al empleado de Gobierno porque dichos empleados están debidamente protegidos por las garantías que les concede el principio de mérito, al extremo de que -en caso de despido injustificado- éstos tienen derecho a ser reinstalados en sus puestos. Eso explica que las disposiciones de la Ley se hayan destinado esencialmente al empleado de la empresa privada y que no se deba extender su aplicación a la esfera gubernamental.

Aclarado lo anterior, debemos analizar el Art. 6 de la Ley Núm. 80, supra, con el fin de determinar si dicha disposición aplica en el contexto del traspaso de una entidad gubernamental. Como indicamos antes, el referido artículo dispone que:

> "En el caso del traspaso de un **negocio** en marcha, si el nuevo adquirente continúa

> utilizando los servicios de los empleados que estaban trabajando con el anterior dueño, se les acreditará a éstos el tiempo que lleven trabajando en el negocio bajo anteriores dueños". 29 L.P.R.A. Sec. 185f. (Énfasis suplido).

En esencia, la disposición transcrita le concede al empleado retenido por el adquirente de un negocio en marcha el derecho a trasladar consigo los años trabajados a favor del patrono anterior. Ese beneficio, sin embargo, no aplica en todo contexto. Más bien, entendemos que la posibilidad de trasladar esos años de servicio constituye un beneficio de antigüedad, entre otras cosas, complementario al pago de la mesada que supone, por tanto, que el empleado que lo invoca ya estaba protegido por las disposiciones de la Ley. En vista de que la disposición aludida forma parte de las medidas que viabilizan el pago de la mesada, lógicamente debemos entender que la misma se refiere a un empleado que ya estaba protegido por la Ley antes del traspaso del negocio en marcha, y que ahora invoca esta disposición para que la protección que ya poseía no se vea afectada por el traspaso en cuestión. Sólo de esa forma se justifica que el empleado traslade consigo los años de servicio ofrecidos al patrono anterior.

Concluir lo contrario produciría el contrasentido de que un empleado que no tenía derecho al pago de la mesada antes del traspaso, tendría un beneficio mayor que cualquier otro empleado, toda vez que podría ser acreedor al pago de la mesada en el nuevo sitio de empleo y,

adicional a eso, se vería favorecido por haber prestado servicios en una entidad <u>donde no tenía derecho al pago de la mesada</u>. Así, el mero hecho del traspaso haría que los empleados de Gobierno, que no tenían derecho al pago de la mesada porque su *status* laboral les provee unas garantías mayores, tengan acceso a ello por el período que duró su permanencia en el Gobierno, pero de forma retroactiva. Entonces, para todos los fines prácticos, es como si siempre hubieran estado cobijados por las protecciones de la Ley Núm. 80, supra. Claramente ese resultado no es cónsono con el resto del ordenamiento ni con los propósitos mismos de la Ley Núm. 80, supra.

Por otro lado, precisamente la inaplicabilidad de la Ley Núm. 80, supra, en las relaciones laborales entre el Gobierno y sus empleados, así como el hecho de que el Departamento de Salud es una agencia del Gobierno y no un negocio, nos ofrece otra razón para concluir que el Art. 6 de dicho estatuto resulta inaplicable a los hechos de este caso. Ello en vista de que, si la Ley Núm. 80, supra, no le aplica al Gobierno y, además, dicha entidad no constituye un negocio, entonces cuando se habla de "traspaso de <u>negocio</u> en marcha"[5], se hace referencia al traspaso de un <u>negocio privado</u>, y no a la transferencia de una entidad u organismo gubernamental, como lo era el

---

[5] "Negocio en marcha" se ha definido como aquel que se mantiene operando de forma continua y con la expectativa de seguir funcionando indefinidamente. <u>Montalbán Ruiz v. Rodríguez Navarro</u>, res. el 23 de marzo de 2004, 2004 TSPR 42.

Hospital Tito Mattei perteneciente a, y operado por, el Departamento de Salud.

Siendo así, resolvemos que la norma contenida en el Art. 6 de la Ley Núm. 80, supra, no aplica a los hechos de este caso. Por lo tanto, la señora Mercado Ortiz no puede ampararse en ella para solicitar que, en el cómputo de la mesada a la que pudiera tener derecho, se tomen en cuenta los años que trabajó para el Departamento de Salud.

B

Ahora bien, el Art. 6 de la Ley Núm. 80, supra, no es la única fuente en la que se ampara la señora Mercado Ortiz para solicitar que -en el cómputo de la mesada- se tomen en cuenta los años trabajados para el Departamento de Salud. Su reclamo está basado también en la doctrina del "patrono sucesor". Dicha doctrina nos ha servido en ocasiones anteriores para atender situaciones donde una operación comercial cambia de propietario y surgen problemas respecto a los derechos de los empleados frente al nuevo patrono. Bruno López v. Motorplan, 134 D.P.R. 111 (1993). Conforme a la misma, cuando un patrono sustituye a otro por fusión corporativa o transferencia de activos, se estima que el nuevo patrono asumirá las obligaciones pertinentes contraídas por el anterior. Id.

En Puerto Rico, hemos aplicado la doctrina del patrono sucesor para hacer valer los términos de un convenio colectivo, Beaunit of Puerto Rico v. J.R.T., 93

D.P.R. 509 (1966); J.R.T. v. Coop. Azucarera, 98 D.P.R. 314 (1970); para imponer responsabilidad a un patrono sucesor por las prácticas ilícitas del trabajo cometidas por el patrono anterior, J.R.T. v. Club Náutico, 97 D.P.R. 386 (1969); para imponer responsabilidad a un patrono sucesor por despidos discriminatorios realizados por el predecesor, Bruno López v. Motorplan, supra; Belk Arce v. Martínez, 146 D.P.R. 215 (1998) y para imponerle responsabilidad al nuevo adquirente de un negocio por despidos injustificados cometidos por el patrono anterior, Piñero v. Int'l Air Serv. of. P.R., 140 D.P.R. 343 (1996); Rodríguez Oquendo v. Petrie Retail Inc., res. el 11 de abril de 2006, 2006 TSPR 56.

A la luz de esta doctrina, hemos examinado si existe una similaridad sustancial en la operación de la empresa y continuidad en su identidad antes y después del cambio corporativo. Piñero v. Int'l Air Serv. of. P.R., supra. En específico, auscultamos la presencia de los siguientes factores para determinar la aplicabilidad de la doctrina: (1) la existencia de una continuación sustancial de la misma actividad de negocios; (2) la utilización de la misma planta para las operaciones; (3) el empleo de la misma o sustancialmente la misma fuerza obrera; (4) la conservación del mismo personal de supervisión; (5) la utilización del mismo equipo y maquinaria y el empleo de los mismos métodos de producción; (6) la producción de los mismos productos y la prestación de los mismos

servicios; (7) la retención del mismo nombre; y (8) la operación del negocio durante el período de transición. Rodríguez Oquendo v. Petrie Retail Inc., supra; Piñero v. Int'l Air Serv. of P.R., supra.

Al amparo de la referida doctrina, la señora Mercado Ortiz alega que Adventist Health advino patrono sucesor del Departamento de Salud ya que mantuvo los mismos servicios, la misma planta física y esencialmente el mismo personal. Por consiguiente, la recurrida sostiene que trasladó consigo los años trabajados para dicha entidad. No podemos darle la razón.

Hasta el momento, hemos aplicado la doctrina del patrono sucesor en casos particulares donde existe un reclamo de un empleado que está basado en un acto u obligación originalmente imputable al patrono predecesor. Es decir, sólo hemos utilizado dicha doctrina para imponerle responsabilidad a un nuevo patrono que ha mantenido la continuidad del negocio adquirido, pero en ocasiones en que se le reclama a ese nuevo patrono por un acto u obligación del que debió responder el patrono anterior. De ahí la necesidad misma de recurrir a dicha doctrina.

En este caso, sin embargo, se invoca la referida doctrina, no para que se le imponga responsabilidad al nuevo dueño por un acto u obligación imputable al patrono predecesor, sino para que se le imponga una mayor responsabilidad al nuevo patrono por un acto cometido por

él mismo. Así, en este caso no se cumple el requisito de umbral que hasta el momento ha hecho necesaria la aplicación de la doctrina del patrono sucesor, a saber, la existencia de una reclamación basada en un acto u obligación contraída por el patrono predecesor (Departamento de Salud) que pueda ser oponible ante el nuevo patrono (Adventist Health) por virtud de esta doctrina.

Por el contrario, el único reclamo de la señora Mercado Ortiz es contra su patrono actual, Adventist Health, y el mismo no está basado en un acto u obligación atribuible al Departamento de Salud. En vista de ello, concluimos que la doctrina del patrono sucesor no es aplicable a los hechos de este caso, toda vez que aquí no se encuentran presentes los factores o circunstancias que generalmente han dado lugar a su aplicación[6].

Por otro lado, aún si se pudiera entender que la doctrina del patrono sucesor se extiende a este tipo de reclamación, entendemos que las disposiciones de la Ley Núm. 190, supra, impiden su aplicación a los hechos de este caso. Dicha legislación se creó con el fin de reglamentar el proceso de privatización de las instalaciones de salud gubernamentales que se estaba desarrollando bajo el palio de la Ley de la Administración de Seguros de Salud de Puerto Rico, Ley

---

[6] No estamos resolviendo –por no estar ante nuestra consideración en esta ocasión– si en otro contexto podría aplicar la doctrina del patrono sucesor cuando el patrono predecesor es el Gobierno.

Núm. 72 de 7 de septiembre de 1993, según enmendada. Exposición de Motivos, Ley Núm. 190, supra. Mediante su aprobación, el legislador pretendió crear un marco estatutario para el desarrollo de la privatización, de manera que se pudieran implementar los cambios introducidos por la Ley Núm. 72, supra, a saber, (1) permitirle al Gobierno de Puerto Rico abandonar su función tradicional de proveedor de servicios, para convertirse en agente fiscalizador, evaluador y regulador de los sistemas de salud y asumir el papel de promotor de la salud y procurador del paciente; y (2) permitirle al Gobierno arrendar o, de otra forma, transferir a entidades privadas las instalaciones de salud pública, para que estas entidades **las operen como empresas privadas**, sujeto a las leyes del mercado y la libre competencia. Exposición de Motivos, Ley Núm. 190, supra.

A tono con esta política pública, se incluyó en la Ley Núm. 190, supra, una disposición que impide que se entablen reclamaciones en contra del adquirente de la facilidad privatizada que estén basadas en hechos o eventos que hubieran sido imputables al Gobierno de Puerto Rico. En específico, el Artículo 22 del estatuto[7], dispone —en lo pertinente— lo siguiente:

> "La entidad contratante o intereses privados que adquieran cualesquiera de las instalaciones de salud en virtud de lo dispuesto en este capítulo, estarán inmunes

---

[7] Enmendado mediante la Ley Núm. 31 de 6 de julio de 1997 para incluir, entre otras cosas, la inmunidad aludida.

o exentos de reclamaciones de cualquier índole que de otro modo ser[í]an atribuibles al Gobierno de Puerto Rico, incluyendo, pero no limitándose a reclamaciones laborales, contractuales, torticeras, o extra contractuales siempre y cuando dichas reclamaciones estuviesen relacionadas con hechos o eventos ocurridos con anterioridad a la firma de los contratos de privatización". 24 L.P.R.A. Sec. 3320.

Resulta evidente que mediante la introducción de esa disposición el legislador quiso evitar reclamos laborales cimentados, precisamente, en la doctrina del patrono sucesor. A esos fines, dispuso que el adquirente de la facilidad privatizada no será responsable por hechos o eventos atribuibles al Gobierno. De esa forma, despejó cualquier interrogante que pudiera surgir con respecto a las responsabilidades que asumen los adquirentes de las facilidades de salud transferidas dentro del esquema contemplado en la Ley.

No cabe duda, por tanto, que el Art. 22 de la Ley Núm. 190, supra, establece la inaplicabilidad de la doctrina del patrono sucesor en el contexto de los procesos de privatización. Por consiguiente, y en vista de que tampoco aplica en este contexto el Art. 6 de la Ley Núm. 80, supra, resulta forzoso concluir que no se pueden tomar en consideración, para efectos del cómputo de la mesada a la que pueda tener derecho la señora Mercado Ortiz, los años que ésta trabajó para el Departamento de Salud antes de que el Hospital pasara a manos de la empresa privada.

III

Por los fundamentos que anteceden, revocamos la Sentencia emitida por el Tribunal de Apelaciones y, en su lugar, reinstalamos el dictamen emitido por el Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.

Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Adventist Health System Corp.

   Peticionaria

         v.                    CC-2005-1229     Certiorari

Lourdes Mercado Ortiz

   Recurrida


SENTENCIA


San Juan, Puerto Rico a 30 de mayo de 2007.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la Sentencia emitida por el Tribunal de Apelaciones y, en su lugar, reinstalamos el dictamen emitido por el Tribunal de Primera Instancia.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Fiol Matta disiente con Opinión escrita a la cual se une el Juez Asociado señor Fuster Berlingeri.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Adventist Health System Corp.
      Peticionaria

v.

                                CC-2005-1229     *Certiorari*

Lourdes Mercado Ortiz
      Recurrida

Opinión disidente emitida por la Jueza Asociada señora FIOL MATTA a la cual se une el Juez Asociado señor FUSTER BERLINGERI

En San Juan, Puerto Rico, a 30 de mayo de 2007.

> *Para el trabajador, partícipe menor en los frutos de la empresa, para quien no hay liquidación de dividendos, ni beneficios, ni intereses acumulados en la digna faena de ganar con sus esfuerzos el pan que parte en la mesa con los suyos, para quien el ahorro es ilusión devorada por la estrechez, la indemnización por despido injustificado es importante evento de la justicia social debida al hombre como factor de producción.*
>
> —Secretario del Trabajo v. I.T.T., 108 D.P.R. 536, 547 (1979)

La decisión que toma hoy una mayoría de los miembros de esta Curia cierra de forma lamentable un capítulo en la vida de los empleados públicos

que se han visto afectados por la privatización de distintos servicios prestados hasta hace poco por el Estado. Nuestras decisiones respecto a ellos no deben socavar la política pública a favor de la clase trabajadora puertorriqueña proclamada en nuestra legislación laboral y respaldada por nuestra jurisprudencia. Menos aún, cuando ello resulta en una injusticia contra antiguos empleados públicos que ya sufren los perjuicios de perder un trabajo sobre el cual tenían un interés jurídicamente reconocido. La Opinión de este Tribunal coloca a estos empleados en una situación indudablemente desventajosa porque no solo han perdido los beneficios que disfrutaban como empleados públicos sino que se les niegan derechos reconocidos a los demás empleados del sector privado. Ante el sombrío precedente sentado por este Tribunal, es mi obligación disentir vigorosamente. A continuación explico mis razones.

I

Desde 1930, existe en Puerto Rico una fuerte política pública laboral a favor de la protección efectiva del empleo y de los trabajadores despedidos sin justa causa o caprichosamente por sus patronos. Conforme a esta política, se adoptó en 1949 la primera Ley de la mesada, la Ley núm. 50 del 20 de abril de 1949, que fue sustituida por la ley vigente actualmente, la Ley núm. 80 del 30 de mayo de 1976, 29 L.P.R.A. secs. 185a-185m. Ésta provee un remedio de aturaleza económica, conocido como la mesada, para que los empleados así despedidos reciban

una compensación por los daños que les causa su patrono con su acción injustificada. Por lo general, el patrono deberá indemnizar al empleado despedido sin justa causa con una mesada proporcional a los años de servicios rendidos para su propio establecimiento o empresa. 29 L.P.R.A. sec. 185a. Sin embargo, el artículo 6 de la Ley núm. 80 permite transferir la responsabilidad de un patrono a otro, cuando se transfiere un establecimiento en marcha y el segundo patrono decide mantener en la nómina a los empleados del anterior. La Ley formula esta doctrina de la siguiente manera:

> En el caso del traspaso de un negocio en marcha, si el nuevo adquirente continúa utilizando los servicios de los empleados que estaban trabajando con el anterior dueño, se les acreditará a éstos el tiempo que lleven trabajando en el negocio bajo anteriores dueños. 29 L.P.R.A. sec. 185f.

De esta forma, si el adquirente de un establecimiento que retiene a empleados del patrono anterior despide sin justa causa a alguno de estos empleados, se incluirá en el cálculo de la mesada los años que éstos trabajaron para el patrono anterior.

La Ley núm. 80 no define concretamente qué constituye un "negocio en marcha" para efectos de la mesada. La Opinión mayoritaria, por su parte, le niega esta categoría a las instalaciones de salud del Gobierno adquiridas por empresas privadas mediante el esquema de privatización implementado por la Ley núm. 190 del 5 de septiembre de 1996. Concluye que los empleados que sean

despedidos sin justa causa de una instalación de esta naturaleza no tienen derecho a que se tomen en consideración, para computar la mesada, los años de servicio prestados previamente al Departamento de Salud del Estado Libre Asociado.

La mayoría razona que la Ley núm. 80 no cubre a los empleados gubernamentales porque éstos ya están protegidos por un interés jurídicamente reconocido en la retención de su empleo y por las garantías que les concede el principio del mérito y la legislación aplicable al personal del servicio público. Entiende entonces que incluir los años de servicio público en el cómputo de la mesada que debe pagar el nuevo patrono brindaría a estos empleados un beneficio mayor al de cualquier otro empleado de la empresa privada. Por eso, concluye que cuando una entidad pública se convierte en una empresa privada, el derecho a la mesada de los ex empleados públicos que sean despedidos injustificadamente por el nuevo patrono no debe incluir los años de servicio público trabajados previamente en el mismo establecimiento. En esencia, la Opinión mayoritaria resuelve que los años de servicios prestados a un patrono anterior se tomarán en cuenta al computar la mesada sólo si el empleado despedido sin justa causa estaba protegido por la Ley núm. 80 antes que se traspasara la empresa al nuevo patrono.

Según la Opinión, el propósito de la doctrina del negocio en marcha es evitar que las protecciones que provee la Ley núm. 80 al empleado se vean afectadas por el traspaso de titularidad de su lugar de empleo. Ello implica que si la Ley núm. 80 no cobija inicialmente a estos empleados, no hay protección estatutaria que se afecte por la venta o transferencia de la empresa. De esta forma, el empleado de una institución perteneciente a una agencia gubernamental que sea privatizada *pierde* esos años de servicio público para efectos de la mesada, al ser retenido por la empresa privada que adquirió dicha facilidad pública. Como a su lugar anterior de empleo no le aplicaba la Ley núm. 80, el ex-empleado público no puede trasladar los años de servicio ofrecidos a su patrono anterior.

Por otro lado, la Mayoría del Tribunal resuelve que una entidad gubernamental no es ni puede ser un "negocio en marcha" según se contempla en la Ley núm. 80. Razona la mayoría que la Ley regula "esencialmente" las relaciones laborales de las empresas privadas lucrativas, y que las disposiciones de la Ley núm. 80 no se extienden a las relaciones laborales entre el Departamento de Salud y sus empleados. Al no aplicar la Ley a las agencias del Gobierno del Estado Libre Asociado de Puerto Rico, éstas tampoco pueden estar incluidas en el concepto de negocio en marcha del artículo 6 de la Ley. Por consiguiente, la doctrina del negocio en marcha solo puede referirse al

traspaso de negocios privados y no a la transferencia de entidades gubernamentales, incluso cuando éstas sean vendidas mediante un proceso de privatización. Cabe señalar que se llega a esta conclusión sin examen alguno de ese proceso.

Además de lo anterior, la Mayoría del Tribunal también descarta la aplicación al caso de autos de la doctrina del patrono sucesor, establecida y desarrollada en nuestra jurisprudencia. Véase, e.g., Piñeiro v. International Air Services of Puerto Rico, Inc., 140 D.P.R. 343 (1996); Bruno López v. Motorplan, Inc., 134 D.P.R. 111 (1993); Beaunit of Puerto Rico v. Junta de Relaciones del Trabajo, 93 D.P.R. 509 (1966). Determina en cuanto a esta doctrina que en "los hechos de este caso... no se encuentran presentes los factores o circunstancias que generalmente han dado lugar a su aplicación". Opinión mayoritaria, pág. 15. A su vez, concluye que la inmunidad concedida por el artículo 22 de la Ley núm. 190 contra reclamaciones laborales basadas en hechos o eventos que sean imputables al Gobierno de Puerto Rico impide la aplicación de la doctrina del patrono sucesor a las empresas que adquieran alguna instalación pública de salud al amparo de esta Ley.[8]

---

[8] El artículo 22 dispone en lo pertinente:

La entidad contratante o intereses privados que adquieran cualesquiera de las instalaciones de salud en virtud de lo dispuesto en este capítulo, estarán inmunes o

II

Esta interpretación de la Ley núm. 80, desvinculada del proceso de privatización y en extremo mecánica, contradice la política pública ínsita a dicha Ley, además de que trastoca las normas de hermenéutica aplicables a reclamaciones laborales. Hemos reconocido consistentemente que las leyes laborales, al ser instrumentos de justicia social, deben ser interpretadas liberalmente para cumplir sus propósitos reparadores de garantizar la mayor protección de los derechos de la clase trabajadora. El efecto de esta norma liberal de interpretación es que toda duda en cuanto a la aplicación de una disposición legal laboral debe resolverse a favor del empleado. Jiménez Marrero v. General Instruments, Inc., 2007 T.S.P.R. 13; Cintrón Díaz v. The Ritz Carlton San Juan Spa Hotel & Casino, 2004 T.S.P.R. 82; Piñero González v. A.A.A., 146 D.P.R. 890, 902 (1998); Muñoz Hernández v. Policía de Puerto Rico, 134 D.P.R. 486, 495-96 (1993). En el caso de autos, este principio exegético fue desatendido por la mayoría de este Tribunal. Veamos.

---

exentos de reclamaciones de cualquier índole que de otro modo serán atribuibles al Gobierno de Puerto Rico, incluyendo, pero no limitándose a reclamaciones laborales, contractuales, torticeras, o extracontractuales siempre y cuando dichas reclamaciones estuviesen relacionadas con hechos o eventos ocurridos con anterioridad a la firma de los contratos de privatización. 24 L.P.R.A. sec. 3320.

La aprobación de la Ley núm. 80 del 30 de mayo de 1976 representó un paso significativo en la política laboral puertorriqueña de protección del empleo. Su propósito principal es proteger al trabajador en la tenencia de su empleo y, a su vez, desalentar los despidos caprichosos e injustificados. Por eso, la Ley provee una indemnización a los empleados que hayan sido despedidos injustificadamente, siendo justa causa para el despido aquellas circunstancias prescritas en el propio estatuto. El remedio de la mesada sirve de resarcimiento al empleado por los daños y perjuicios sufridos a consecuencia del despido injustificado, no constituye una remuneración o salarios por servicios prestados. Alvira v. SK & F Laboratorios Co., 142 D.P.R. 803, 810 (1997). La mesada se estableció como un alivio parcial a la situación de desamparo que enfrenta un empleado al perder su medio habitual de sustento, permitiéndole una ayuda económica para sostener a su familia en la transición a un nuevo empleo sin tener que convertirse en carga para el Estado. Secretario del Trabajo v. I.T.T., 108 D.P.R. 536, 547 (1979).

La Ley núm. 80 es el estatuto general de despido, que aplica a todo despido injustificado, excepto en aquellas situaciones que están cobijadas por alguna otra ley laboral específica de carácter excluyente. En esos contextos fácticos protegidos por esas otras leyes, los remedios provistos pueden ser superiores a los de la Ley

núm. 80, ya que pueden incluir la reposición del trabajador en su empleo.  Sin embargo, en situaciones no cubiertas por alguna otra legislación, la mesada es el remedio estatutario para los empleados despedidos sin justa causa. Véase Oficina del Procurador del Trabajo del Departamento del Trabajo y Recursos Humanos de Puerto Rico, Guías para la interpretación y aplicación de la Ley núm. 80, aprobada el día 30 de mayo de 1976, 1979, pág. 6; Ruy N. Delgado Zayas, Apuntes para el Estudio de la Legislación Protectora del Trabajo en el Derecho Laboral Puertorriqueño, San Juan, 2005, págs. 114-115.

Hemos visto que la Ley núm. 80 también protege a los empleados de una empresa que son retenidos en su empleo por un nuevo dueño, haciendo responsable a éste del pago de la mesada como si dichos empleados le hubiesen prestado servicios desde que comenzaron a trabajar para el patrono anterior.  Art. 6 Ley núm. 80, 29 L.P.R.A. sec. 185f; Guías para la interpretación y aplicación de la Ley núm. 80, pág. 44.  Cuando el nuevo dueño adquiere el negocio en marcha, los empleados del patrono anterior que sean retenidos mantienen el mismo estatus que tenían cuando se trasladó la titularidad de su lugar de empleo. En otras palabras, si al ser retenido por el adquirente el empleado tenía carácter de permanente en el negocio en marcha, mantendrá esta condición ante el nuevo patrono.  Id., pág. 47.

La razón de ser de esta doctrina es que estos empleados retenidos, a través de su antigüedad y los años de trabajo con el dueño anterior, han adquirido unos derechos que no pueden ser ignorados cuando su patrono opta por traspasar el lugar de empleo a un nuevo dueño. Véase Charles Zeno Santiago & Víctor M. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Publicaciones JTS, 2003, Tomo I, pág. 135. Cuando el nuevo dueño mantiene en la nómina de la entidad adquirida a empleados del dueño anterior, se beneficia de la experiencia y conocimiento específico adquiridos por éstos a través de los años, además de la plusvalía por razón de su trabajo. Esto, indudablemente, redunda en beneficio del negocio y del nuevo patrono, por lo que si éste despide a alguno de ellos injustificadamente debe pagar la indemnización completa que exige la Ley, tomando en consideración los años servidos al patrono anterior.

Ahora bien, la Ley no distingue entre tipos de empresa para limitar su aplicación. No requiere que la entidad adquirida sea de determinada naturaleza. La Ley dispone escuetamente que se le acreditará en la mesada " el tiempo que [los empleados] lleven trabajando en el negocio bajo *anteriores dueños*". 29 L.P.R.A. sec. 185f (énfasis suplido). Específicamente, no requiere que el patrono anterior tuviera la obligación legal de pagar mesada ante un despido injustificado. El artículo 6 se refiere al "traspaso de un negocio en marcha"  sin

precisar si dicho "negocio" traspasado debe ser privado, lucrativo o comercial, ni prohibir expresamente que sea una entidad pública de naturaleza privatizable.

Provoca confusión el énfasis que da la Opinión mayoritaria al interés "lucrativo" que deben tener las empresas a las cuales les aplica la Ley núm. 80. La Opinión da a entender que las disposiciones de la Ley sólo aplican a entidades de "índole comercial y empresarial" y alude a la mención en la Ley de entidades de "comercio, industrias y negocios". Para apoyar su conclusión, cita del historial legislativo de la Ley núm. 80, que a su entender demuestra que la Asamblea Legislativa pretendía, con este lenguaje, que las disposiciones de la Ley sólo protegieran a empleados de "comercio, industria o cualquier otro negocio lucrativo". Opinión mayoritaria, pág. 6 (citando a Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes de Puerto Rico sobre el P. del S. 1112).

Esta es una interpretación desafortunada del historial legislativo, pues la frase del Informe que cita la Opinión mayoritaria no se refería a la Ley núm. 80. Lo que se indica en el Informe citado es que la *predecesora* de la Ley núm. 80, la Ley núm. 50, protegía a los empleados de negocios lucrativos, y que uno de los propósitos de la nueva Ley era *eliminar este requisito de lucro* sin el cual la Ley núm. 50 no aplicaba. Véase

Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes de Puerto Rico sobre el P. del S. 1112, pág. 2.[9] Por eso, mientras que la Ley núm. 50 sólo cobijaba al empleado "de comercio, industria o cualquier otro negocio lucrativo", la Ley núm. 80 eliminó la condición de "lucrativo" y añadió "cualquier otro negocio o *sitio de empleo*". 29 L.P.R.A. sec. 185a (énfasis suplido). En fin, la Opinión mayoritaria restringe excesivamente el alcance de la palabra "negocio" sin tomar en consideración que una interpretación teleológica, es decir, verdaderamente guiada por el propósito de la Ley núm. 80, demuestra que

---

[9]  En el Informe presentado ante la Cámara de Representantes sobre el Proyecto de Senado 1112, que se aprobaría como la Ley núm. 80 del 30 de mayo de 1976, se señala:

> *La ley actual [Ley núm. 50] protege a los empleados de comercio, industira o cualquier otro negocio lucrativo* que estén contratados sin tiempo determinado contra la eventualidad de ser despedidos de su cargo sin justa causa, pero solamente concede una indemnización equivalente a un mes de sueldo en el supuesto de que se produzca el despido bajo las indicadas circunstancias.

> *El proyecto que estamos considerando elimina el requisito de lucro sin el cual la ley actual no aplica* y establece por primera vez en nuestra jurisdicción la indemnización progresiva por el despido injustificado, consistente dicha indemnización progresiva en una indemnización básica equivalente al sueldo de un mes y una indemnización progresiva adicional equivalente a una semana por cada año de servicios. Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes de Puerto Rico sobre el P. del S. 1112, págs. 1-2 (énfasis suplido).

ésta buscaba expandir el ámbito de protección laboral, descartando el ánimo de lucro como medida de aplicación, para así asegurar la protección más efectiva a los empleados despedidos injustificadamente.

En el caso de autos, la Opinión mayoritaria desdeña el principio liberal de exégesis reconocido en nuestro ordenamiento que nos obliga a interpretar todo estatuto laboral de la forma más justiciera y remedial posible. Esta metodología de interpretación liberal nos impide introducir restricciones al alcance de una disposición estatutaria laboral, cuando dichas limitaciones no están contenidas expresamente en la propia Ley. La exclusión de un empleado de los beneficios de la legislación laboral debe desprenderse de forma clara y manifiesta de sus disposiciones, y en todo caso de interpretarse restrictivamente. Muñoz Hernández v. Policía de Puerto Rico, supra, pág. 496; López Vega v. F. Vega Otero, Inc., 103 D.P.R. 175, 177 (1974).

Para situaciones como la que aquí tenemos que resolver, la doctrina del "traspaso de un negocio en marcha", según estatuida en el artículo 6 de la Ley núm. 80, expone de forma clara los elementos para su aplicación. En primer lugar, tiene que haber un patrono anterior, dueño de un establecimiento que sea lugar de trabajo para determinados empleados. Luego, el establecimiento laboral o "negocio en marcha" debe ser adquirido por un nuevo dueño. En tercer lugar, el nuevo

adquirente debe optar por conservar en la empresa adquirida a los empleados del dueño anterior, adviniendo de esta forma a ser su nuevo patrono. Por último, se requiere que el nuevo patrono despida sin justa causa a alguno de estos empleados retenidos, siendo así responsable de pagar la indemnización conforme lo requiere la Ley, incluyéndose en el cómputo de la mesada los años de servicio prestados al patrono anterior.

En cuanto al patrono anterior la Ley no establece condición alguna. En particular, la disposición estatutaria no requiere que el patrono anterior estuviera sujeto a la Ley núm. 80. Sin embargo, la Opinión mayoritaria suple el silencio legislativo en cuanto a este aspecto introduciendo una limitación al alcance de la Ley. Con ello se aparta de los principios generales de interpretación de leyes laborales, y adopta una interpretación que es contraria a la política pública de la Ley, que aspira a brindar la protección más eficaz posible a la seguridad del empleo de los trabajadores en Puerto Rico. El resultado es añadir al artículo 6 de la Ley núm. 80 algo que el legislador no contempló, dos tipos de negocio en marcha para efectos de la mesada: uno en el cual los empleados acreditan el tiempo que trabajaron para el patrono anterior, y otro en el cual los empleados simplemente pierden estos años de servicio.

Sin embargo, en la médula del razonamiento de la Opinión mayoritaria se encuentra, realmente, su

convencimiento de que una facilidad pública, aun cuando sea vendida a un ente privado, no es ni puede ser un "negocio en marcha" para efectos de la Ley núm. 80. Como hemos señalado, llega a esta conclusión utilizando un método contrario a los principios básicos de interpretación de la legislación laboral. Pero llama la atención también la ausencia de un análisis de las particularidades del proceso de privatización. Ese análisis, que me parece insoslayable, demuestra que estas entidades privatizadas constituyen un negocio en marcha para efectos de la Ley.

## III

La privatización de empresas públicas cobró auge durante la segunda mitad del siglo XX. Particularmente, los decenios finales del milenio pasado fueron testigos de la transferencia por diversos estados de funciones y activos públicos al sector privado. Esta transformación gubernamental que se conoce como privatización es una combinación de fenómenos y procesos diferentes, en los cuales se destaca la participación del sector privado en campos tradicionalmente ocupados por la acción gubernamental, disminuyéndose de esta forma el rol participante del Estado en los asuntos socioeconómicos. Ramón J. Cao García, Planificación y Privatización, 1 (Núm. 2) Ceteris Paribus: Revista de Investigaciones Socioeconómicas 113, 117 (1991). Por tanto, la privatización funciona como un proceso de reorganización

de las prioridades sociales de un gobierno, para someter ciertas actividades gubernamentales y la prestación de ciertos servicios públicos a las dinámicas económicas del mercado. De esta forma, el sistema burocrático gubernamental es reemplazado por empresas privadas, y los favorecidos por estos servicios públicos son transformados en clientela. Kevin R. Kosar, Privatization and the Federal Government: An Introduction, Congressional Research Service, 28 de diciembre de 2006, pág. 6.

Las teorías normativas que justifican la doctrina de la privatización se originan en el siglo XVIII. La política pública que apoya el proceso de privatizar servicios gubernamentales está inspirada en la visión individualista del *laissez faire* y las teorías económicas del libre mercado, que promueven la competencia en el mercado y la disminución de la intervención gubernamental. También promueve la privatización el pensamiento neoconservador, desarrollado durante las últimas décadas del siglo XX, que visualiza la privatización como una estrategia política para reducir la llamada "sobrecarga" del Estado. Paul Starr, The Meaning of Privatization, 6 Yale L. & Pol'y Rev. 6, 20 (1988).

No obstante, la privatización, tal y como se ha desarrollado actualmente, funciona como un instrumento de ejecución del neoliberalismo y al igual que éste aspira a

restablecer plenamente los mecanismos del mercado, disminuir el rol decisorio del Estado en los mercados de bienes y servicios, encauzar la economía en manos privadas, encontrar acceso al capital del comercio internacional, y permitir el funcionamiento de una llamada libertad económica. Hernando Agudelo Villa, Estado, política de desarrollo y privatización, en ¿Privatización o estatización? Perspectivas de un debate, Bogotá, Departamento de Publicaciones de la Cámara de Comercio de Bogotá, 1989, págs. 42-44. La premisa clásica a favor de la privatización es el argumento de que las empresas privadas, compelidas por el ánimo del lucro y la maximización de ganancias, son más eficaces que el Estado para ofrecer servicios a la ciudadanía. Héctor A. Ríos Maury, Privatización: Formas, mitos y aspectos gerenciales, Puerto Rico, Ediciones Nueva Aurora, 1998, pág. 47. Se basa, pues, en una visión escéptica del Estado en su rol de proveedor de servicios y en una percepción del mismo como un empresario incompetente e improductivo.

Son numerosas las explicaciones y justificaciones para la adopción de la privatización como una opción para la reconfiguración de las relaciones entre el gobierno y el sector privado. En Puerto Rico, se ha defendido la implantación de esta política basada en las condiciones socioeconómicas prevalecientes desde las últimas décadas del siglo pasado. Éstas, a su vez, se han identificado

por algunos economistas como resultado de políticas gubernamentales intervencionistas adoptadas en respuesta a la desaceleración de la economía a partir de los años sesenta. Estas políticas, junto a otros factores, resultaron en una nómina pública abultada y recursos que se percibían mal distribuidos y utilizados.[10] Véase Cao García, supra, págs. 127; Consejo de Planificación Estratégica del Sector Privado, Informe Final: Privatización de los Servicios Públicos (Fase 2), Cámara de Comercio de Puerto Rico, 1989, págs. 7-9.

Como respuesta a esta situación, se ha planteado la idea de redefinir el papel del Estado como proveedor de servicios. Así, se propuso el proceso de privatización en Puerto Rico como una forma de atraer recursos del sector privado para proveer determinados servicios públicos e incrementar la eficiencia de éstos, además de proveer

---

[10] Los economistas señalan que a pesar de que Puerto Rico disfrutó de una tasa rápida de crecimiento económico durante las décadas siguientes a la posguerra, a partir de los años setenta, la economía registró una desaceleración severa que llevó a un estancamiento recesivo. Cao García, supra, págs. 121-122. Recalcan que por ello, el sector gubernamental puertorriqueño adquirió una importancia creciente al intentar inyectarle dinamismo a la actividad económica mediante la estimulación de la producción y la creación de nuevos empleos. También señalan una serie de causas para que este rol protagónico llevara a hacer atractiva, décadas después, la alternativa de la privatización. En particular, destacan el aumento en gastos corrientes del gobierno, específicamente en empleos públicos, y la desatención en las inversiones de infraestructura, lo que trajo como resultado una nómina gubernamental abultada y recursos mal distribuidos y utilizados. Cao García, supra, págs. 127; Informe Final: Privatización de los Servicios Públicos (Fase 2), op. cit., págs. 7-9.

métodos alternos de financiamiento y aumentos en los recursos fiscales del gobierno. Informe Final: Privatización de los Servicios Públicos (Fase 2), op. cit., pág. 9.

La privatización es un proceso que puede manifestarse en diversas formas.[11] De los numerosos modelos de privatización disponibles, el más utilizado en Puerto Rico y en la mayoría de los países que han optado por acogerse a este proceso es el del *traspaso de actividades gubernamentales* al sector privado mediante la venta de activos de una agencia o corporación pública.[12] En esencia, la venta de una entidad gubernamental lo único que altera es el estado legal de ésta, ya que pasa de ser propiedad pública a propiedad privada. En el caso de la

---

[11]   Entre los modelos de privatización más utilizados se encuentran: la subcontratación de actividades al sector privado; el uso de cupones (*vouchers*); la responsabilidad compartida del gobierno y el sector privado para ofrecer un servicio, ya sea mediante empresas conjuntas, división de fases o incluso la competencia directa en el mercado; la liquidación de empresas o actividades gubernamentales; la acción comunitaria con estímulo gubernamental, donde el Estado dona activos, provee incentivos o traslada la administración de una actividad a comunidades; y el permitir que asociaciones voluntarias o filantrópicas provean determinados servicios públicos. Informe Final: Privatización de los Servicios Públicos (Fase 2), op. cit., pág. 5. Véase también Consejo de Planificación Estratégica del Sector Privado, Informe Final: Privatización de los Servicios Públicos (Fase 1), Cámara de Comercio de Puerto Rico, 1988, págs. 4-9.

[12]   Las alternativas dentro de este modelo son la venta total o parcial de la empresa a una entidad privada, la venta de acciones al público en general, o la venta o donación de la empresa a empleados, para que estos la administren. Informe Final: Privatización de los Servicios Públicos (Fase 2), op. cit., pág. 5.

venta total de una entidad pública, el traspaso de titularidad indica usualmente sólo un cambio en la administración y gerencia de la entidad pero no en su estructura y, en ocasiones, tampoco en su personalidad. Consejo de Planificación Estratégica del Sector Privado, Informe Final: Privatización de los Servicios Públicos (Fase 1), Cámara de Comercio de Puerto Rico, 1988, pág. 5. Ello se debe a que son precisamente la estructura y la personalidad de una entidad pública las que atraen la atención de los licitadores para su compra. De la misma forma, éstos también buscan adquirir como clientela suya a aquellos ciudadanos que utilizan estos servicios públicos.

En la situación descrita, y como cuestión de realidad, la entidad pública se vende como un *negocio en marcha* (*ongoing business* o *going concern*), o sea transfiriéndola en su totalidad como una unidad comerciable. Otra opción sería no venderla como un todo sino disolverla como empresa, y, de esta forma, vender sus bienes y activos de forma individual. Emmanuel S. Savas, Privatization and Public-Private Partnerships, New York, Chatham House Publishers, 2000, págs. 129-132; Charles Vuylsteke, Techniques of Privatization of State-Owned Enterprises: Methods and Implementation, 2da impresión, Washington, D.C., World Bank Technical Paper Number 88, 1989, Volumen I, págs. 20-21. Bajo esta segunda opción, el organismo público se desintegra como

entidad, sus partes son vendidas de forma individual, y no hay continuidad de servicios, sino una venta de bienes y activos.[13] Así, mientras en la opción de la venta como negocio en marcha se traspasa una operación para su continuación, en la segunda hay una desintegración total.

Es la venta de la entidad pública como negocio en marcha lo que permite a la empresa privada adquirente asumir la identidad del establecimiento vendido. En estos casos, la nueva empresa continúa ofreciendo servicios de igual o similar naturaleza a los ofrecidos por el Estado. A su vez, utiliza la misma estructura para sus operaciones, con el mismo equipo y usualmente métodos de producción similares. En ocasiones, además, conserva la misma fuerza obrera para la operación de la empresa, ahora manejada con ánimo de lucro. Es precisamente por estas razones, que los estudiosos del tema hablan de la entidad pública *vendida como un negocio en marcha*.[14]

---

[13] La liquidación de una empresa pública como una modalidad de privatización es utilizada por el Estado cuando, entre otras cosas, el propósito funcional de la entidad ya no es relevante, inversionistas privados no están interesados en la compra de la entidad como un negocio en marcha, o la planta física de la empresa a ser vendida tiene mayor valor comercial que el negocio como tal. Emmanuel S. Savas, Privatization and Public-Private Partnerships, New York, Chatham House Publishers, 2000, pág. 217.

[14] El concepto negocio en marcha, como *going concern*, se usa también cuando el Estado vende todas o algunas de sus *acciones* en una empresa gubernamental. Esta forma de privatización requiere que el negocio en venta sea una corporación debidamente incorporada. Véase Charles Vuylsteke, Techniques of Privatization of State-Owned Enterprises: Methods and Implementation, 2da impresión,

IV

El sistema de servicios de salud público es uno de los sectores gubernamentales que se ha privatizado en épocas recientes. Como parte de la "reforma de salud" realizada en la década del noventa, se inició un proceso de privatización de algunos hospitales y facilidades de salud operados por el Departamento de Salud y la Administración de Facilidades y Servicios de Salud de Puerto Rico. Con este propósito se aprobó la Ley núm. 190 del 5 de septiembre de 1996, 24 L.P.R.A. secs. 3301-3325, para permitir y reglamentar la transferencia de titularidad de las facilidades públicas de salud al sector privado para que sean operadas como empresas privadas. Uno de los objetivos primordiales de la Ley es permitir que la libre competencia en la prestación de los servicios de salud sirva de aliciente para mejorar su calidad. Otro objetivo es retirar al Gobierno de su rol de proveedor de servicios, para entonces fortalecer su función de agente fiscalizador, evaluador y regulador de los sistemas de salud. Véase Informe de la Comisión de Gobierno de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 2479, 13 de junio de 1996; Informe de la Comisión de Gobierno del Senado de Puerto Rico sobre el P. de la C. 2479, 21 de junio de 1996.

---

Washington, D.C., World Bank Technical Paper Number 88, 1989, Volumen I, págs. 11-20.

A diferencia de legislaciones anteriores, la Ley núm. 190 permite delegar o ceder la operación de instalaciones de salud a empresas privadas, así como arrendarlas o traspasar su titularidad. Id. La Ley le concede al Secretario de Salud la discreción necesaria para arrendar, subarrendar, vender, ceder, permutar o transferir permanentemente las instalaciones de salud cuya titularidad pertenezca al Gobierno, sus agencias o instrumentalidades. 24 L.P.R.A. sec. 3320. En la Ley se adopta como definición de "instalación de salud", la que dispone la Ley de Facilidades de Salud, 24 L.P.R.A. secs. 331-334j. El concepto es tan amplio como para abarcar cualesquiera de los establecimientos que se dedican a la prestación de servicios de salud, sean hospitales, centros de salud, centros de diagnóstico y tratamiento, casas de salud, centros de rehabilitación, facilidades de cuidado de larga duración, entre otros. 24 L.P.R.A. sec. 331a. Ahora bien, la Ley núm. 190 expande esta definición, para incluir dentro del concepto de "instalación de salud" al "equipo y el inventario instalado en, o utilizado en relación con la operación de la misma". 24 L.P.R.A. sec. 3301.

La Ley ordena que todo acuerdo de transferencia de una instalación de salud pública a una entidad privada deberá seguir las disposiciones que la misma Ley establece. 24 L.P.R.A. sec. 3302. En particular, las entidades privadas contratantes están obligadas a

utilizar las instalaciones adquiridas en un ambiente de cuidado de salud dirigido que sea cónsono con los propósitos de la Ley y la filosofía de la reforma de salud. 24 L.P.R.A. sec. 3305. En cuanto a la operación de las facilidades privatizadas, las disposiciones estatutarias son muy cuidadosas al disponer que los servicios médicos que ofrecen las instalaciones de salud serán continuos y no se verán afectados por el proceso de transferencia a entidades privadas.

En primer lugar, la Ley indica que toda propuesta de las entidades interesadas debe tomar en consideración la organización estructural y funcional de los servicios de salud de la instalación particular. A base de esto, se hará un plan de trabajo divido en fases para entonces poder implantar la organización y los servicios que contemple establecer el licitador. 24 L.P.R.A. sec. 3307. En segundo lugar, al evaluar las propuestas sometidas para adquirir una instalación, el Secretario de Salud debe determinar qué modelo de transferencia será el más apropiado según la instalación de salud que se trate, las circunstancias económicas de la región en que se ubique y las necesidades y características de la población que sirve. 24 L.P.R.A. sec. 3308. Incluso, la Ley establece expresamente que como único se podrá eximir a la entidad contratante de continuar ofreciendo servicios de cuidado de salud en la instalación adquirida es mediante una determinación del Secretario de Salud y del Banco

Gubernamental de Fomento a estos efectos y que indique que la región en la que está localizada la instalación ya está adecuadamente servida por otras facilidades de salud. 24 L.P.R.A. sec. 3305.

Cabe destacar otro asunto en cuanto al proceso de privatización de las instalaciones de salud públicas. La Ley núm. 190 señalaba originalmente, en su artículo 21, que el precio mínimo de venta de la facilidad sería aquel que por tasación dispusiera el Departamento de Hacienda o el de Salud. No obstante, la Ley núm. 31 del 6 de julio de 1997 enmendó esta disposición para establecer *el valor de mercado* como el precio de venta de cada instalación. 24 L.P.R.A. sec. 3320. Tanto la exposición de motivos de la Ley núm. 31 como su historial legislativo muestran que la intención del legislador era que el precio de la facilidad no fuese un valor de tasación de reemplazo de un inmueble. Por el contrario, se entendió que durante la venta de las facilidades de salud deberían tomarse en cuenta otros factores adicionales, entre ellos el equipo a transferirse y otras variables del mercado. Véase Informe de las Comisiones de Gobierno y de Salud de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 691, 17 de junio de 1997. Así, al momento de determinar el precio de venta de la instalación se estimará su valor global, tomando en consideración la estructura, organización, potencial, y los otros factores ya mencionados.

Conforme a lo anterior, se colige forzosamente que las disposiciones de la Ley núm. 190 disponen para la venta de las facilidades de salud públicas *como negocios en marcha*. Primeramente, la Ley da énfasis a que la entidad contratante no interrumpa los servicios médicos que ofrece la instalación vendida durante el proceso de privatización, y que luego del traspaso su operación se mantenga ajustada a las necesidades y características de la población servida por cada instalación. El estatuto no le concede discreción a la entidad contratante para darle otro uso a la facilidad adquirida que no sea aquel indicado en la Ley, salvo autorización expresa del Secretario de Salud y el Banco Gubernamental de Fomento. En otras palabras, la facilidad que sea privatizada deberá continuar utilizándose para ofrecer servicios de cuidado de salud conforme a la política estatal de salud pública. Ello asegura una continuidad estable entre los servicios que antes ofrecía el Gobierno y los que ofrecerá posteriormente la entidad privada adquirente, además de servir de barómetro para asegurar que la operación de la facilidad adelante los propósitos primordiales de la Ley y la filosofía de la llamada reforma de salud.

Segundo, el proceso de privatización de la Ley núm. 190 no sólo incluye la venta de estructuras físicas sino que incluye el equipo e inventario ya instalado en la facilidades para ofrecer los servicios de salud. A esto

se le puede añadir el que la Ley también dispone expresamente para la retención por la entidad contratante de los empleados que trabajaban para el Gobierno en la instalación adquirida. 24 L.P.R.A. sec. 3318. Así, la venta de las facilidades que hace el Gobierno no es una de activos o bienes individuales sino de un establecimiento, con todos sus componentes, transferidos como una unidad integral.

Lo último, mas no menos importante, son los factores a considerarse al determinar el precio de venta. Como parte de esta determinación, no sólo se consideran los elementos estructurales y operativos de la facilidad sino también el valor en el mercado que posee dicha entidad. Fijar el valor del mercado también requiere evaluar otros factores de índole económica, como son los rendimientos financieros que genera o podría generar la actividad desde un punto de vista privado. O sea para obtener el máximo valor de retorno, el precio se fija considerando la instalación *como una unidad comercial integra y como un negocio continuo*.

La venta de una instalación de salud pública como un negocio en marcha asegura la maximización de las ganancias que puede obtener el Gobierno en la transacción. Precisamente, en Puerto Rico, una de las razones de peso para privatizar es la de adquirir fondos con la venta de la entidad para intentar aliviar la crisis fiscal del Estado. Véase Edwin Irizarry Mora,

Privatización de empresas públicas: Apuntes teóricos pertinentes al caso de Puerto Rico, 1 (Núm. 1) Ceteris Paribus: Revista de Investigaciones Socioeconómicas 151, 152 (1991). Debido a sus propósitos intrínsecamente económicos, la privatización requiere la transformación de funciones estatales de beneficencia y asistencia social en servicios y productos comerciales. No nos debe extrañar, por tanto, que para que el Gobierno pueda vender una entidad de servicios públicos tenga que mercadearla como un negocio rentable. Aunque nos parezca incómodo asignarle un valor económico a servicios de naturaleza benéfica y filantrópica, como lo son los servicios médicos primarios, la privatización requiere adoptar una visión negociable de estas instituciones.

V

Aplicando este marco teórico y jurídico a situaciones como la del caso de autos, no podemos concluir otra cosa que no sea resolver que una instalación gubernamental de salud que ha estado sujeta a un proceso de privatización es vendida, de hecho, como un negocio en marcha. De otro modo, estaríamos hablando de una venta pública de bienes gubernamentales. Como hemos discutido, la Ley núm. 190 no establece un proceso de liquidación de entidades públicas para vender sus parte como bienes o activos individualizados. Por el contrario, la Ley formula una oferta de venta globalizada y obliga a que los adquirentes mantengan una continuidad en la

prestación de servicios de la facilidad que les sea transferida. La oferta de compra no sólo incluye el equipo que utilizaba el gobierno para ofrecer los mismos servicios, sino que permite además que las entidades contratantes retengan en su nómina a los empleados públicos que laboraban originalmente para el Departamento de Salud.

La entidad pública se traspasa al sector privado en función de una unidad integral, o como apropiadamente lo han llamado los estudiosos del fenómeno de la privatización, la venta de un negocio en marcha (*ongoing business*). Es claro que bajo la Ley núm. 190 la entidad contratante al adquirir una facilidad de salud pública asume su identidad como proveedor de servicios de cuidado de salud. Estos establecimientos se adquieren con la intención de continuar proveyendo servicios de la misma naturaleza que los que ofrecía el Estado, porque así lo requiere la Ley, y utilizando la misma estructura física, con el mismo equipo e incluso la misma fuerza obrera en las operaciones diarias de la entidad. En conclusión, la venta de una instalación de salud pública presenta varios de los factores que apoyan la aplicación de la doctrina del traspaso de un negocio en marcha según dispuesta en el artículo 6 de la Ley núm. 80.[15]

---

[15] Tengo, además, grandes reparos en cuanto a la conclusión mayoritaria respecto a la inmunidad brindada por el artículo 22 de la Ley núm. 190 y la doctrina del patrono sucesor. Ello porque la controversia particular

Por todo lo anterior, resolvería que al momento de computar la mesada a la que pueda tener derecho la señora Mercado Ortiz, se deben tomar en consideración los años que esta empleada trabajó para el Departamento de Salud antes que la facilidad de salud en la que laboraba pasara a manos de una empresa privada. La señora Mercado Ortiz fue servidora pública por casi dos décadas antes que el Hospital de Área Tito Mattei de Yauco, que servía como su lugar de empleo, fuera privatizado en 1998, según lo permite la Ley núm. 190. Al comprar el hospital, la entidad contratante, Adventist Health System Corp., advino patrono de la señora Mercado Ortiz, ya que retuvo sus servicios junto a los de otros empleados del Departamento de Salud. Sin embargo, en el 2001 el nuevo patrono de la señora Mercado Ortiz la despidió. Antes del despido, Adventist Health se benefició de la experiencia y conocimiento especializado de la señora Mercado Ortiz, al igual que se sirvió de su familiaridad con la instalación en la que trabajaba y de la plusvalía que su labor representaba.

---

del caso autos se resuelve mediante la aplicación adecuada de la Ley núm. 80 y nuestros principios básicos de hermenéutica judicial y no requería, por tanto, que este Tribunal se expresara en cuanto al efecto que tiene la Ley núm. 190 sobre la posible aplicación de la doctrina del patrono sucesor en el contexto de un proceso de privatización. La Mayoría de este Tribunal se excedió en su función adjudicadora al resolver que en cualquier contexto de privatización de instalaciones de salud públicas la Ley núm. 190 hace inaplicable la doctrina del patrono sucesor.

Indudablemente, y como explicamos anteriormente, al utilizar el procedimiento de la Ley núm. 190, Adventist Health adquirió del gobierno el Hospital Tito Mattei de Yauco como un negocio en marcha. Por tanto, le aplicaba el artículo 6 de la Ley núm. 80. Por tal razón, debimos confirmar al Tribunal de Apelaciones en cuanto resolvió que el legislador no excluyó la consideración de los servicios prestados a patronos anteriores por un empleado que fue retenido por la entidad adquirente de un hospital público para los efectos de terminar su mesada bajo la Ley núm. 80. En ausencia de una exclusión categórica, la señora Mercado Ortiz tiene un derecho estatutario a que se le aplique la fórmula de cálculo de la mesada tal y como está establecida en la Ley núm. 80. Como la Opinión mayoritaria llega a un resultado que ignora estas consideraciones y que es contrario a la naturaleza justiciera y remedial de nuestras leyes laborales, me veo obligada a disentir.

VI

Por último, debo puntualizar otra razón para mi disenso. No podemos perder de perspectiva que la privatización, como proceso político y socioeconómico, afecta la seguridad de empleo de miles de empleados públicos. Cuando se vende una instalación de salud pública, la entidad adquirente puede retener a todos, a algunos o a ninguno de los empleados públicos que laboraban en el establecimiento adquirido. Debemos

reconocer que ante el acontecimiento de un proceso de privatización el estatus laboral de estos empleados públicos sufrirá un cambio drástico y es, cuando menos, incierto.

De no ser retenidos por la empresa adquirente, estos empleados serán cesanteados con la sola promesa, no garantizada, de que serán reubicados en algún otro organismo público o empresa privada.[16] 24 L.P.R.A. sec. 3318. Por otro lado, los "afortunados" que sean reclutados por la entidad adquirente perderán su estatus de empleados públicos, con todo lo que ello conlleva. Estos empleados dejarán de ser miembros del servicio público y perderán las garantías que les provee el principio de mérito y los beneficios y protecciones del sistema de empleados del Gobierno. Como empleados del sector privado, aun cuando estén protegidos por otras

---

[16] Los empleados públicos que no sean reclutados por el nuevo patrono podrían ser cesanteados por el Gobierno. Ante estas circunstancias, la Ley núm. 190 sólo ofrece como salvaguarda la política pública observada en Puerto Rico en los casos de reorganización y disolución de organismos gubernamentales. Bajo esta política, el empleado así cesanteado puede elegir entre acogerse a un retiro temprano, solicitar alguna compensación por el tiempo de servicio al Gobierno o solicitar su reubicación el servicio público. Para aquellos empleados que ejerzan esta última opción, la Ley núm. 190 sólo dispone que se creará un registro especial para concederle preferencia a estos servidores públicos para ser reubicados, según la disponibilidad que permitan las plazas, a través de los diferentes organismos gubernamentales y en la empresa privada. 24 L.P.R.A. sec. 3318. Esta disposición estatutaria no garantiza a estos empleados cesanteados un empleo seguro en el Gobierno, ni siquiera que serán reclutados para cualquier otro trabajo.

leyes laborales, estarán en una posición menos ventajosa que antes en cuanto a la seguridad de su empleo.

La Opinión que suscribe una mayoría de este Tribunal perjudica aún más a estos empleados retenidos al resolver que de ser despedidos injustificadamente por su nuevo patrono, no tendrán acceso completo a la legislación social que protege a los demás empleados del sector privado. En otras palabras, estos otrora servidores públicos no estarán cobijados por las garantías y derechos que provee el sistema del mérito, pero tampoco serán protegidos totalmente por aquella legislación que le aplica a la empresa privada. Como la Opinión mayoritaria traza una ruta decisoria injusta para estos ex-empleados públicos y contraria a la legislación social en protección de los trabajadores en Puerto Rico, yo disiento.


                                        Liana Fiol Matta
                                        Jueza Asociada